IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| CHRISTOPHER WENNERMARK; § § Plaintiff, § § v. § § DEWITT COUNTY, CHRISTOPHER SMITH, § WILLIAM RIEMENSCHNEIDER, JERRY § GARZA, SERGEANT JOHNSON, and § DEFENDANTS DOE 1–30; § § Defendants. § | CIVIL ACTION NO. 6:24-cv-31 JURY DEMANDED |

## PLAINTIFF'S COMPLAINT

Plaintiff Christopher Wennermark brings this lawsuit against Defendants DeWitt County, Christopher Smith, William Riemenschneider, Jerry Garza, Sergeant Johnson, and Doe 1–30 because their deliberate indifference caused him permanent injuries.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal question claims brought under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and the Rehabilitation Act (29 U.S.C § 794), pursuant to 28 U.S.C. § 1331 and § 1343.

2. Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as the events complained of occurred within this district and division.

## PARTIES

**A. PLAINTIFF**

3. Plaintiff Christopher Wennermark is a resident of Denton County, Texas. Mr. Wennermark is not currently incarcerated.

B. **DEFENDANTS**

4. DeWitt County, Texas, is a political subdivision of the State of Texas. The County owns and operates the DeWitt County Jail, also called the DeWitt County Detention Center ("the jail"); employs and compensates the staff of the jail; and is charged with ensuring that, at all times, the jail remains in compliance with federal and state law. The County is a recipient of federal funds. The County can be served through County Judge Darryl Fowler, at 307 North Gonzales Street, Cuero, Texas.

5. Christopher Smith was a Lieutenant at the jail employed by DeWitt County at all relevant times. He may be served at 208 E Live Oak St. Suite C, Cuero Texas 77954. Smith is sued in his individual, personal capacity. At all relevant times, Smith acted under color of law.

6. William Riemenschneider worked at the jail employed by DeWitt County at all relevant times. He may be served at 208 E Live Oak St. Suite C, Cuero Texas 77954. Riemenschneider is sued in his individual, personal capacity. At all relevant times, Riemenschneider acted under color of law.

7. Jerry Garza was a Captain at the jail employed by DeWitt County at all relevant times. He may be served at 208 E Live Oak St. Suite C, Cuero Texas 77954. Garza is sued in his individual, personal capacity. At all relevant times, Garza acted under color of law.

8. Sergeant Johnson, whose full name is not known to Plaintiff, worked at the jail employed by DeWitt County at all relevant times. She may be served at 208 E Live Oak St. Suite C, Cuero Texas 77954. Johnson is sued in her individual, personal capacity. At all relevant times, Johnson acted under color of law.

9. Defendant Does 1–30 are unknown persons at the jail who were employed or contracted to work at the DeWitt County Jail at all relevant times. They may be served at 208 E

Live Oak St. Suite C, Cuero Texas 77954. Each Doe Defendant is sued in their respective individual, personal capacities. At all relevant times, each Doe Defendant acted under color of law.

## FACTS

10. Christopher Wennermark was arrested and detained in the DeWitt County jail on October 1, 2022.

11. At all relevant times, Mr. Wennermark suffered from type 2 diabetes with complications including retinopathy, which caused partial blindness, as well as neuropathy, which caused insensitivity to pressure and pain in his extremities.

12. Due to his diabetes, Mr. Wennermark required regular insulin to survive.

13. Although Mr. Wennermark was provided some insulin during his incarceration, Mr. Wennermark was not provided insulin in appropriate amounts and at the correct times with respect to meal times to control his diabetes.

14. Mr. Wennermark's dependence on insulin, and the effects of uncontrolled diabetes, substantially limited the function of his circulatory system. Prolonged high blood glucose hardened, narrowed, and clogged his blood vessels. This resulted in an impairment of his circulatory system's regulation of glucose in surrounding organ tissue. As a result of his diabetes, Mr. Wennermark suffered damage from high blood glucose which permanently impaired other organ systems, including his peripheral nervous system, causing the condition of diabetic neuropathy.

15. Due to his diabetic neuropathy, Mr. Wennermark was far more prone to injuries in his extremities than the average person, and was at much higher risk of permanent damage if he suffered injuries in his extremities.

16. Mr. Wennermark's diabetic neuropathy substantially limited his major bodily functions including his immune system, his peripheral nervous system, his circulatory system, and his blood clotting system compared to an average person.

17. Mr. Wennermark's diabetic neuropathy substantially limited his major life activities including walking, running, and fine motor control of his feet compared to an average person.

18. Because Mr. Wennermark was routinely called to receive insulin, all jail staff who regularly worked in the common areas of the jail during his incarceration, including Defendants, knew he was diabetic.

19. The DeWitt County jail facility, including where Mr. Wennermark was housed, was filthy and he was not provided any means to clean his living area.

20. In December 2022 or January 2023, Mr. Wennermark began to suffer a visible wound in his foot, which was a worrying sign of an infection and necrosis which are common complications of diabetes.

21. The wound to Mr. Wennermark's foot began on the back of his heel, making it difficult for him to detect due to his diabetic neuropathy.

22. Eventually the wound expanded so that there was a hole approximately half an inch deep in Mr. Wennermark's foot.

23. On January 1, 2023, Mr. Wennermark complained in a written grievance that he was being denied the ability to clean his cell and denied access to a doctor, but in an unsigned response, jail staff refused to do anything to help him.

24. Mr. Wennermark's infection became visibly discolored and alarming.

25. Texas jailers are required to personally observe each inmate face-to-face at least once every 60 minutes.

26. As shifts naturally changed during Mr. Wennermark's months of incarceration, many jail staff, including Defendants, conducted these face-to-face observations of Mr. Wennermark and saw his wound was obviously getting worse and worse.

27. In the course of their regular duties at the DeWitt County jail facility, each of the Defendants interacted with Mr. Wennermark face to face and during these conversations, he showed each of them the worsening wound upon the back of his heel. He also told each of them during these conversations that he was diabetic and the wound on his heel was related to his diabetes or diabetic neuropathy.

28. These signs of a serious infection requiring immediate treatment by a doctor were obvious even to a layperson by at least the middle of January 2023. Thus, Defendants each knew Mr. Wennermark's condition was serious and causing him ongoing pain and physical injuries due to the lack of treatment from this point forward.

29. Mr. Wennermark complained to multiple jail staff, including Smith, Riemenschneider, Garza, Johnson, and Does 1–30. In each complaint, Mr. Wennermark again said that he was diabetic and that the wound was related to his diabetes or diabetic neuropathy.

30. For months, Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 refused Mr. Wennermark treatment or access to a doctor, but instead only gave him over-the-counter athlete's foot cream..

31. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 each knew and understood that the visibly growing infection inside Mr. Wennermark's foot would obviously not be treated with the topical cream they provided to him.

32. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 each knew and understood that the infection inside Mr. Wennermark's foot was not being effectively treated with the cream they provided to him because the wound continued to expand and worsen.

33. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 each personally saw Mr. Wennermark's foot after he had been provided the athlete's foot cream. Each personally saw that his wound on his foot was larger and looked worse.

34. Defendants DeWitt County, Smith, Riemenschneider, Garza, Johnson, and Doe 1–30 also failed to provide Mr. Wennermark insulin and metformin at the correct time relative to his meal times on multiple days even after his foot complication, worsening his condition.

35. Mr. Wennermark told each of the Individual Defendants that he had diabetes and that he needed to receive the accommodations of insulin and metformin at the correct time relative to his meals. He explained during these conversations that not receiving these accommodations at the right time would only cause his diabetes to be uncontrolled and would worsen his foot complication.

36. Defendants DeWitt County, Smith, Riemenschneider, Garza, Johnson, and Doe 1–30, also failed to provide Mr. Wennermark with diabetic meals, which further aggravated his condition.

37. Mr. Wennermark told each of the Individual Defendants that he needed the accommodation of diabetic meals in order to correctly dose his insulin and metformin and to control his blood sugar.

38. As a result of the jail's failure to treat or accommodate his diabetes, Mr. Wennermark's glucose levels became dangerously uncontrolled.

39. Specifically, by failing to provide short acting insulin after meals, while providing meals with high levels of carbohydrates, Defendants allowed Mr. Wennermark to experience dangerous blood sugar spikes—high blood sugar when he ate, and low blood sugar when he took short acting insulin on an empty stomach. This practice further aggravated Mr. Wennermark's neuropathy and thus worsened his injury. It also impaired his nutrition, which made him even more vulnerable to the infection compared to an average person.

40. Mr. Wennermark's body was physically dependent on insulin, causing physiological changes to his body—particularly when insulin was improperly administered or withheld, as the jail did here. Because of his diabetes, he suffered blindness, hypertension, and retinopathy. His diabetes therefore greatly limited the operation of his circulatory system, his eyes, his immune system, his nervous system, and other major bodily functions compared to most people without disabilities or of average health.

41. Mr. Wennermark's diabetes and complications including blindness also greatly limited his ability to work and care for himself compared to most people, as well as to engage in other major life activities.

42. Mr. Wennermark complained to his sister, who on or about February 2, 2023 called Defendant Smith and informed him that Mr. Wennermark needed treatment.

43. Mr. Wennermark's sister also emailed Defendant Smith on February 3, 2023, informing him that the foot injury smelled terrible, warned that this was likely due to an infection, and warned that Mr. Wennermark needed to see a doctor.

44. Mr. Wennermark's sister then emailed this same information to Defendant Riemenschneider.

7

45. Discoloration, change in shape, and change in smell are well-known symptoms of severe internal infection—not an exterior skin infection like athlete's foot—which even laypeople understand is a potentially life-threatening emergency, particularly for someone like Mr. Wennermark who suffers from advanced diabetes and was not receiving insulin at the prescribed dosage or time.

46. Smith, Riemenschneider, Garza, and Johnson also met with Mr. Wennermark due to his complaints and due to his sister's complaints, where he repeated his complaints and informed them of his obviously worsening wound.

47. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 each personally observed and understood the seriousness of his medical condition firsthand during this time as they could see the wound getting worse and Mr. Wennermark also explained it to them when they performed face-to-face observations.

48. Each Defendant understood that Mr. Wennermark's blackening, half-inch deep hole in his foot was a medical emergency that risked serious injury if not immediately treated in an emergency room or hospital.

49. Although on February 6, 2023, Smith told Mr. Wennermark's sister that a doctor was caring for Mr. Wennermark, this was not true and Smith knew it was untrue.

50. Instead, Smith, Riemenschneider, Garza, Johnson, and Does 1–30 continued to refuse to treat Mr. Wennermark's growing and alarming infection with anything more than athlete's foot cream which they knew was not sufficient.

51. The athlete's foot cream's own instructions state that it is only appropriate for infections of the skin, whereas Mr. Wennermark's infection and necrosis had visibly invaded the

soft tissue of his heel, nearly a half inch beneath the surface of his skin. The skin on a healthy person's heel is less than an eighth of an inch thick.

52. The athlete's foot cream's instructions further state to contact a doctor if symptoms do not improve in two weeks, but Mr. Wennermark was not permitted to see a doctor for approximately nine weeks.

53. Finally, the Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 at last sent Mr. Wennermark to a podiatrist on March 8, 2023.

54. On information and belief, Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 interfered with Mr. Wennermark's medical care by providing a false medical history to the podiatrist.

55. The podiatrist prescribed antibiotics for Mr. Wennermark's infection.

56. But when Mr. Wennermark was returned to the jail, Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 refused to even provide the antibiotics.

57. Mr. Wennermark's wound grew even larger and foul-smelling—facts Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1-30 knew because each of them saw the wound on Mr. Wennermark's foot after March 8, 2023 and he reported the worsening symptoms to them.

58. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 each subjectively knew that Mr. Wennermark needed to be immediately taken to the emergency room to prevent further serious harm as it was obvious, even to a layperson that his infection required emergent treatment, but refused to send him.

59. On March 14, 2023, Defendants Smith, Riemenschneider, and Does 1–30 forced Mr. Wennermark to walk a city block, and multiple flights of stairs, on his wounded foot, causing extreme pain and aggravating the damage.

60. Mr. Wennermark was finally released on March 15, 2023 and taken to the emergency room, where medical providers diagnosed him with severe gangrene in his foot.

61. Mr. Wennermark's severe gangrene and resulting complications were proximately caused by the unsanitary conditions in the jail which made an infection more likely, delay in actual treatment for his infection, the denial of regular prescribed insulin which exacerbated his vulnerability to the infection, refusal to provide diabetic meals, false information provided to the podiatrist, refusing to provide Mr. Wennermark the medicine ordered by the podiatrist, and refusing to take him to an emergency room or hospital earlier.

62. DeWitt County policymakers, including, but not limited to, the Sheriff, and county commissioners, have made policy-level decisions to limit prisoners' access to medical care in the DeWitt County Jail.

63. Pursuant to these policies and despite not having sufficient medical training to do so, Smith, Riemenschneider, Garza, Johnson, Does 1–30, and other jail staff routinely withheld and still withhold emergency services and medical care to save money.

64. DeWitt County had a policy, practice, and custom of allowing unqualified, untrained jail staff to decide when an inmate required medical care.

65. DeWitt County also does not provide training on the dangers of infections, diabetic retinopathy, or other common emergency medical conditions to jailers and other staff, including the Defendants, despite having the jailers and other jail staff serve as gatekeepers for medical care.

66. As a result, staff with no expertise are left "diagnosing" inmates' serious medical conditions and emergencies.

67. The County, through its aforementioned policymakers, adopted or approved these policies and practices even though it knew this would endanger prisoners and would deny prisoners needed care.

68. Diabetes and infections are an obvious, recurring danger to inmates in county jails, where inmates frequently arrive with medical conditions that need attention.

69. Diabetes and infections are recurring situations that jailers are certain to confront.

70. If untreated, diabetes and infection are each extremely dangerous and can cause death preceded by immense pain and suffering.

71. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 at the DeWitt County Jail were not trained to identify medical conditions, including diabetes and infections, that require treatment by a doctor.

72. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 at the DeWitt County Jail were not trained to understand their responsibility to secure minimal medical care for disabled or sick inmates like Mr. Wennermark, as well as the gravity of the need for physicians' care when detainees suffer diabetes and infections.

73. The DeWitt County Sheriff and other County officials knew jail staff would regularly encounter detainees suffering medical conditions that posed a substantial risk of serious harm if untreated and which exceeded the abilities of any jail staff to treat. Nonetheless, the Sheriff did not train staff to ensure detainees had access to medical care for those medical conditions.

74. Upon information and belief, the Sheriff, and any other County policymakers approved of these dangerous policies to save money. Though policymakers knew this would endanger prisoners, they failed to provide needed medical care or adequate training for staff.

75. Upon information and belief, these policies were part of the County's purposeful under-funding of medical expenses at the DeWitt County Jail.

## CAUSES OF ACTION

### I.  42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
(Plaintiff's *Monell* Claim Against DeWitt County)

76. At the time of the incident, DeWitt County had the following policies and practices—all of which were known to County policymakers, which were adopted with deliberate indifference to the well-being and constitutional rights or its detainees, and which were the moving force of Mr. Wennermark's injuries and the constitutional injuries he suffered:

   a. Denying adequate medical care to detainees;

   b. Delaying detainees' access to medical care;

   c. Underfunding health care at the jail, proximately causing denials and delays of care;

   d. Failing to train officers concerning diabetes;

   e. Failing to train officers concerning infections;

   f. Failing to train officers concerning recognizing medical conditions that required professional treatment;

   g. Failing to provide for sanitary detainee living conditions;

   h. Failing to make reasonable accommodations for inmates suffering from diabetes, including providing insulin timed properly with meals as well as diabetic meals;

   i. Failing to implement policies or procedures to address the dangers of diabetes;

   j. Failing to implement policies or procedures to address the dangers of infections;

k.  Improper use of non-effective over-the-counter medications as an excuse to delay or avoid allowing inmates to see a doctor;

l.  Failing to follow discharge instructions from medical providers; and

m.  Failing to obtain medications prescribed to inmates and provide them consistent with doctor instructions.

77. These conditions were sufficiently well known and pervasive to constitute policymakers' intended conditions and practices at the DeWitt County Jail.

78. These practices and conditions had no legitimate penological purpose, were adopted with deliberate indifference to the health and safety of DeWitt County inmates, and were actually known, constructively known, and/or ratified by DeWitt County and its policymakers (including the Sheriff and Commissioners).

79. Moreover, the known and obvious consequence of these policies was that DeWitt County jail staff would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

80. These conditions of confinement were the result of deliberate choices made by County policymakers, including the Sheriff, despite the obvious danger to inmates housed inside the jail. Policymakers at the jail knew of these dangerous policies and conditions of confinement but failed to protect detainees from them.

81. The jail's system for providing inmates access to medical care was known by County policymakers to be wholly inadequate to treat inmates with serious, medical and psychiatric conditions.

82. The County's deliberate indifference to the serious medical needs of its prisoners in the jail, like Mr. Wennermark, caused him to needlessly suffer and incur permanent injuries.

83. Moreover, each of these policies and practices of the individual Defendants were known to the Sheriff and approved or ratified, either tacitly or directly, by the Sheriff.

84. Despite these known and obvious problems, County policymakers did nothing to protect the rights of prisoners in the jail or to remedy the dangerous conditions.

85. As a direct result and proximate cause of the foregoing, Mr. Wennermark suffered pain and permanent impairment due to the deprivations of his Fourteenth Amendment rights.

86. Mr. Wennermark needed multiple surgeries, has permanently diminished mobility, and his chronic conditions have been aggravated.

## II. 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
(As to the individual Defendants)

87. Plaintiff brings suit against the individual Defendants, pursuant to 42 U.S.C. § 1983, for violating Mr. Wennermark's Fourteenth Amendment right to receive medical care and be provided access to medical care as a pre-trial detainee.

88. Defendants Smith, Riemenschneider, Garza, Johnson, and Does 1–30 subjectively knew that Mr. Wennermark was suffering an objectively serious medical problem and experiencing obvious symptoms including progressively worsening pain, discoloration, and putrid smell from his foot. Defendants knew these were signs of an internal infection that they were incapable of diagnosing and treating. Defendants knew that Mr. Wennermark was not being treated and that he needed to be taken to an emergency room or hospital as early as January, but they refused to provide that access to medical care. Despite their actual knowledge, each Defendant refused to provide Mr. Wennermark medical care they knew he needed, or ensure he received access to actual medical care, to prevent serious harm to Mr. Wennermark. Even when a medical

professional did prescribe care—antibiotics—each Defendant refused to obtain or give the treatment to Mr. Wennermark,

89. Defendant Smith personally declined to seek or authorize medical care for Mr. Wennermark, delaying his care for weeks, despite actual knowledge of his medical emergency. Smith actually learned of Mr. Wennermark's worsening condition by personally observing it when he performed his supervisory duties. Smith also learned of Mr. Wennermark's worsening condition by speaking to Mr. Wennermark's sister and to subordinate jailers.

90. Defendant Riemenschneider personally declined to seek medical care for Mr. Wennermark, delaying his care for weeks, despite actual knowledge of his medical emergency. Riemenschneider actually learned of Mr. Wennermark's worsening condition by personally observing it when he performed his supervisory duties. Riemenschneider also learned of Mr. Wennermark's worsening condition by reading Mr. Wennermark's sister's email and by speaking to subordinate jailers.

91. Defendant Garza personally declined to seek medical care for Mr. Wennermark, delaying his care for weeks, despite actual knowledge of his medical emergency. Garza personally observed Mr. Wennermark's worsening condition when conducting rounds and by speaking to subordinate jailers.

92. Defendant Johnson personally declined to seek medical care for Mr. Wennermark, delaying his care for weeks, despite actual knowledge of his medical emergency. Johnson personally observed Mr. Wennermark's worsening condition when conducting rounds and by speaking to subordinate jailers.

93. Defendant Does 1–30 each personally declined to seek medical care for Mr. Wennermark, delaying his care for weeks, despite actual knowledge of his medical emergency.

Defendant Does 1–30 personally observed Mr. Wennermark's worsening conditions during the course of their rounds and other duties requiring them to have face-to-face interactions with Mr. Wennermark where he would show them his wound and report that it kept getting worse.

94. As a direct and proximate consequence of Defendants' deliberate indifference, Mr. Wennermark suffered pain, permanent injuries, and permanent impairment.

### III. AMERICANS WITH DISABILITIES ACT/ REHABILITATION ACT
(As to Defendant DeWitt County)

95. DeWitt County has been, and is, a recipient of federal funds, and thus is covered by the mandate of the Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. 29 U.S.C. § 794.

96. Further, Title II of the ADA applies to DeWitt County, a public entity, and has the same mandate as the Rehabilitation Act. 42 U.S.C. § 12131 *et seq*.

97. The DeWitt County Jail is a facility, and its operations comprise a program and service, for Rehabilitation Act and ADA purposes.

98. For purposes of the ADA and Rehabilitation Act, Mr. Wennermark was a qualified individual with or regarded as having a mental impairment (diabetic neuropathy) and physical impairment (insulin dependent type II diabetes and diabetic retinopathy) that substantially limited one or more of his major life activities.

99. Defendant DeWitt County, through its agents, knew Mr. Wennermark suffered from diabetes mellitus and was experiencing severe symptoms of an infection, including pain, discoloration, and a putrid smell, and that he needed prescription medications that had been ordered by actual medical providers. Further, the County knew that Mr. Wennermark required

16

trained monitoring and access to medical care to protect him from the increasing severity of his problems.

100. The County further knew that Mr. Wennermark had no access to diabetic meals, metformin, or insulin without the County's assistance, yet it refused to provide these when he needed them and even after he asked for them, repeatedly. At best, it provided improper meals many hours before or after giving him his medicine, which frustrated Mr. Wennermark's ability to manage his diabetes, worsened his injuries, made him more prone to these injuries, and aggravated his diabetes.

101. Despite this knowledge, DeWitt County's agents intentionally discriminated against him, under the meaning of the ADA and Rehabilitation Act, by failing and refusing to provide him reasonable accommodations, such as (i) sanitary housing conditions, (ii) access to medical care capable of diagnosing him and treating him, (iii) access to physician-ordered medicine, (iv) access to insulin close to meal time; (v) access to metformin close to meal time; (vi) diabetic meals; and (vii) training for jail staff on the dangers of diabetes and infections.

102. As alleged above, DeWitt County failed and refused to reasonably accommodate Mr. Wennermark's disabilities while in custody, in violation of the ADA and Rehabilitation Act. That failure and refusal was intentional and proximately caused him to suffer pain and permanent impairment.

**DAMAGES**

103. Plaintiff seeks compensatory damages against all Defendants and punitive damages against the individual Defendants only in light of their egregious conduct.

104. Plaintiff seeks the following damages:

- conscious physical pain and mental anguish;
- past and future disfigurement;

- past and future lost wages and lost earning capacity;
- past and future medical expenses;
- attorneys' fees, expenses (including expert expenses), and costs pursuant to 42 U.S.C. § 1988, the 42 U.S.C. § 12205, or as otherwise allowed by law; and
- punitive damages as to the individual Defendants.

## ATTORNEYS' FEES AND COSTS

105. Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover attorneys' fees, costs, and expenses against all Defendants as to the 42 U.S.C. § 1983 claims. Additionally, pursuant to 42 U.S.C. § 12205, Plaintiff is entitled to recover attorneys' fees, costs, and expenses (including expert expenses) against Defendants DeWitt County as to the ADA and Rehabilitation Act claims.

## JURY DEMAND

106. Pursuant to Federal Rule of Civil Procedure 48, Plaintiff hereby requests a jury trial.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff requests that the Court:

A. Award compensatory damages against the Defendants;

B. Award punitive damages against the individual Defendants;

C. Award pre-judgment and post-judgment interest at the highest rate available under the law;

D. Find that Plaintiff is the prevailing party in this case and award him attorneys' fees, court costs, expert costs, and litigation expenses; and,

E. Grant such other and further relief as appears reasonable and just, to which Plaintiff may be entitled.

Dated: September 23, 2024.

Respectfully submitted,

EDWARDS LAW
603 W. 17TH ST.
AUSTIN, TX  78701
Tel.  512-623-7727
Fax.  512-623-7729

By: /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Attorney-in-charge
MIKE SINGLEY
State Bar No. 00794642
mike@edwards-law.com
DAVID JAMES
Southern District No. 2496580
State Bar No. 24092572
LISA SNEAD
State Bar No. 24062204
lisa@edwards-law.com
PAUL SAMUEL
State Bar No. 24124463
paul@edwards-law.com

ATTORNEYS FOR PLAINTIFF