IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WENNERMARK; | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 6:24-cv-31 |
| | § | |
| DEWITT COUNTY, et al.; | § | |
| | § | JURY DEMANDED |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT DEWITT COUNTY'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

The Court should deny Defendant DeWitt County's motion to dismiss Plaintiff's amended complaint, Doc. 32, as Plaintiff Christopher Wennermark has stated claims against DeWitt County.

## I.    SUMMARY OF THE ARGUMENT

The Court should deny DeWitt County's motion to dismiss for three reasons.

First, the amended complaint states § 1983 claims pursuant to *Monell*. DeWitt County jail had deficient access to medical care, unsanitary conditions, and no training on staff's duty provide access to medical care. These policies caused violations of Wennermark's constitutional rights.

Second, Plaintiff also states Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) claims. Despite knowing he suffered a growing diabetic ulcer that required accommodations for him to access the jail's programs and services, DeWitt County withheld these accommodations, thereby also unreasonably inflicting more pain on Wennermark than on non-disabled detainees.

Third, in the alternative, to the extent the Court requires more detailed pleadings on DeWitt County's liability, it should authorize Wennermark to further amend his complaint after he has obtained discovery relating to his claims against DeWitt County.

Accordingly, the Court should deny DeWitt County's motion to dismiss.

## II.    STATEMENT OF FACTS

Plaintiff Wennermark brings this § 1983, ADA, and RA case arising from the jail's intentional mistreatment of his medical conditions, failure to accommodate his known disabilities, and infliction of more pain and punishment on him because of his disabilities. Doc. 23.

After his arrest and detention on October 1, 2022, Wennermark's heel was injured in the jail in approximately January 2023. Doc. 23, p. 5, ¶ 25.

The jail knew Wennermark suffered (and still suffers) from severe, insulin-dependent diabetes—a well-recognized disability—that, in his case, included complications like neuropathy and retinopathy that impaired his senses of touch and sight. Doc. 23, pp. 4–5, ¶¶ 16, 19–23, 26.

In a January 1, 2023 grievance, Wennermark sought access to a doctor and the ability to clean his filthy cell, but the jail refused these accommodations. Doc. 23, p. 5, ¶ 28. Due to the lack of these accommodations, Wennermark's wound grew into an obvious diabetic ulcer—increasing in size and discoloration from infection. Doc. 23, pp. 5–6, 7–8, ¶¶ 25, 27, 29, 44–45. In the small jail, each individual defendant saw Wennermark's progressively worsening and obviously painful diabetic wound and heard his complaints, yet they refused treatment for weeks. Id. at 6, ¶¶ 32–35.

Finally, Wennermark's sister emailed Defendants William Riemenschneider and Lieutenant Christopher Smith. Doc. 23, pp. 6–7, ¶¶ 36–40. Smith falsely claimed Wennermark had already been treated, but, after the email, Wennermark was finally seen by the on-site nurse. Id.

Unfortunately, the nurse, Defendant Jennifer Stinnett, gave Wennermark only an over-the-counter athlete's foot cream which did nothing for Wennermark's obviously infected diabetic ulcer. Id. at 7, ¶ 40. Athlete's foot cream obviously cannot treat an infected wound, so everyone knew Stinnett's "care" was ineffective (and intentionally incorrect). Id. at 7–8, ¶¶ 41–42, 52. They also knew this because the infection continued to visibly worsen. Id. at 7–8, ¶¶ 43, 47.

Nonetheless, athlete's foot cream was the only "treatment" provided for over a month. Doc. 23, pp. 8–9, ¶¶ 48–51, 54. (This delay also reflected a misuse of the athlete's foot cream, which has written instructions to see a doctor if symptoms do not improve in two weeks. *Id.* at 9, ¶ 53.)

On March 8, 2023, the jail finally sent Wennermark to see a podiatrist. Doc. 23, p. 9, ¶ 55. The podiatrist prescribed antibiotics and daily dressing changes, as both were necessary to treat the diabetic ulcer and accommodate Wennermark's disability. *Id.* at 9–10, ¶¶ 56–57.

Yet the jail intentionally disregarded these written orders—Wennermark was never given the antibiotics and the jail changed his dressing only twice in seven days. *Id.* at 10, 11, ¶¶ 59, 65. On at least one occasion, Stinnett claims she refused to provide the dressing change because jailer William Reese (falsely) told her Wennermark refused treatment unless he was allowed a wheelchair to reach the clinic. *Id.* at 10, ¶ 62. Though Stinnett could have seen Wennermark in his cell or provided him a wheelchair, each an obvious accommodation for his disability, she refused both; thus, she withheld doctor-ordered dressing changes for his diabetic ulcer. *Id.* at 10, ¶ 61.

As a result of the jail staff intentionally disobeying the doctor's orders, Wennermark's diabetic ulcer continued to grow and to smell worse and worse—which the individual Defendants each saw, smelled, and understood to be a medical emergency. *Id.* at 11, ¶¶ 66–67.

On March 14, 2023, Stinnett told Defendant Captain Jerry Garza directly that Wennermark needed to be sent to the emergency room for the wound in his foot, but Garza refused to send him. Doc. 23, p. 11, ¶ 68. Instead, Garza, Stinnett, and jailer Ronny Beldin forced Wennermark to walk the length of a city block and climb stairs on his foot to get to court, inflicting severe pain and causing further injury. *Id.* at 11, ¶ 69. The jail finally released Wennermark on March 15, 2023 and he immediately went to the emergency room. *Id.* at 11, ¶ 70. By that point, the jail's conditions and misconduct had caused his diabetic ulcer to progress to severe gangrene, which required

multiple surgeries to treat and permanently impaired his mobility. *Id.* at 11–12, 17, ¶¶ 70–71, 104.

Wennermark's entire ordeal arose from the conditions of the jail, which, in turn, resulted from intentional policy decisions—starting with his dirty cell and ending with the jail's provision of intentionally dilatory medical care to detainees. Doc. 23, pp. 15–16, ¶¶ 94–95, 99–104. These conditions, and the choices to not remedy them, refused Wennermark necessary accommodations for his diabetes and disability-related complications—in turn, inflicting more pain and injury on him than was inflicted on non-disabled detainees. *Id.* at 9, 11, 13, 24, 25, ¶¶ 54, 66, 80, 134, 138.

Among DeWitt County's policy decisions was the approval of the delay and denial tactics of Defendant Southern Health Partners (SHP) in order to save money. Doc. 23, pp. 13–14, 16, ¶¶ 84, 87–89, 94(l). DeWitt County expected SHP, who employed Stinnett, to save the County money by understaffing the jail infirmary; withholding care from inmates; intentionally providing cheaper incorrect treatments; and delaying, limiting, and outright refusing off-site transportation to qualified medical providers. *Id.* at 14, 17–18, ¶¶ 89, 105(m–l). These practices even extended to the recurring scenario of receiving time-sensitive doctors' orders and prescriptions necessary to prevent serious harm from a detainee's medical condition such that these orders were intentionally disregarded. Doc. 23, pp. 15–16, ¶ 94(l–m). Despite knowing of these practices and their likelihood of dire consequences to detainees like Wennermark, the jail's policymakers approved of and continued to tolerate them. *Id.* at 13, 16, ¶¶ 83, 95–97. These same practices also served to deny Wennermark necessary and prescribed accommodations for his disability. *Id.* at 25, ¶ 138.

In addition, DeWitt County also does not defer to SHP providers' rare directions for heightened levels of care but instead has an untrained jailer—such as Captain Garza—withhold or give approval. Doc. 23, pp. 12, 13, 15–16, ¶¶ 73–76, 81–82, 94(d–f), (k). This policy and related lack of training were implemented despite (or because of) the obvious risk of interfering with

medical treatment and other accommodations that inmates like Wennermark would need to prevent serious harm and more pain than average detainees. *Id.* at 13, 16, 24, 25, ¶¶ 83, 95–97, 136, 137.

## III.   LEGAL STANDARD

In evaluating a 12(b)(6) motion to dismiss, the Court "construe[s] facts in the light most favorable to the nonmoving party, as a motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (internal quotation marks omitted). "[T]he complaint need not articulate detailed factual allegations," but they must be plausible. *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (internal quotation marks omitted). Allegations are plausible when their factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A civil rights plaintiff cannot plead, and is not required to plead, facts "peculiarly within the knowledge of defendants." *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995). Moreover, "in the context of municipal liability … it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Bright v. City of Killeen, Texas*, No. 6:20-CV-431, 2021 WL 1226560, at *4 (W.D. Tex. Mar. 31, 2021) (internal quotation marks omitted). Thus, "only minimal factual allegations should be required at the motion to dismiss stage" and the plaintiff "may be more general" in describing the challenged municipal policies, practices, patterns, and training (or lack thereof). *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011); *see also Booth v. Galveston Cnty.*, 352 F. Supp. 3d 718, 747 (S.D. Tex. 2019); *Brown v. City of Houston*, 297 F. Supp. 3d 748, 766 (S.D. Tex. 2017); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. Oct. 6, 2017).

## IV.  ARGUMENT

The Court should deny Defendant DeWitt County's motion to dismiss for three reasons.

### A.  The amended complaint states *Monell* claims against DeWitt County.

Plaintiff alleges an array of policy decisions that were the moving force of the underlying constitutional violations.  Doc. 23, pp. 5, 12–16, ¶¶ 24, 72–86, 94–104. These allegations satisfy *Monell*, without the need to show a pattern of prior violations, particularly at the pleading stage.

> #### 1.  *DeWitt County's staff and contractors violated Plaintiff's constitutional right to adequate medical care in jail.*

As an initial matter, Plaintiff certainly alleges that DeWitt County's staff and contractors violated his constitutional rights. Pretrial detainees are protected from "deliberate indifference" to their serious "medical needs." *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003). "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "The mere delay of medical care can also constitute an Eighth Amendment violation … if there has been deliberate indifference that results in substantial harm." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

Specifically, a jailer or jail medical provider is liable upon "a showing that the [jailer or jail medical provider] was subjectively aware of the risk of serious harm to the inmate" and that the jailer then "disregards [the] excessive risk." *See Easter*, 467 F.3d at 463. The Fifth Circuit applies an Eighth Amendment standard to both jail and prison claims. *See, e.g.*, *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419, n.4 (5th Cir. 2017).[1]

---

[1] Although this distinction is not relevant at this stage because Plaintiff alleges subjective knowledge and deliberate indifference, *see, e.g.*, Doc. 23, p. 20, ¶ 117, the Fifth Circuit's precedent

Here, Plaintiff alleges five jailers and two jail medical providers specifically knew and chose to disregard a substantial risk of serious harm to him when they intentionally refused and delayed the medical treatment they knew he needed. These refusals and delays included giving him a medication they knew was incorrect and would not treat his diabetic ulcer, refusing to administer prescribed medications and dressing changes, refusing to send him to an emergency room despite knowing it was necessary, and ignoring his complaints. *See* Doc. 23, pp. 5–11, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–69, 117–126. As a result of these intentionally incorrect treatments, delays, and violations of doctor's orders, Plaintiff had to take himself to the ER upon his release and suffered gangrene which did permanent damage. *Id.* at 11–12, 23, ¶¶ 70–71, 127.

Jail staff's denying and delaying Wennermark treatment, ignoring his complaints, and knowingly treating him incorrectly violated Wennermark's constitutional rights. *See Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *see, also e.g.*, *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (constitutional rights violated by disobeying doctors' orders to change dressing); *Easter*, 467 F.3d at 463–466 (delaying access to heart medication); *Kelson v. Clark*, 1 F.4th 411, 418–19, 421 (5th Cir. 2021) (not treating visible head injury); *Brown v. Strain*, 663 F.3d 245, 250 (5th Cir. 2011) (delayed calling ambulance for drug overdose); *U.S. v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006) *abrogated on other grounds by U.S. v. Vargas-Ocampo*, 747 F.3d 299, 300 (5th Cir. 2014) (en banc) (delayed treatment for spinal injury); *Austin*, 328 F.3d at 210

---

conflicts with the Constitution. Pretrial detainees are protected from objectively unreasonable denial of medical care by the Fourteenth Amendment, even in the absence of subjective deliberate indifference. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (applying *objective* standard to excessive force claims brought by pre-trial detainees); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2nd Cir. 2017) (extending *Kingsley* to medical care claims); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (same); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (same); *Colbruno v. Kessler*, 928 F.3d 1155, 1161–63 (10th Cir. 2019) (same); *Richmond v. Huq*, 885 F.3d 928, 938, n.3 (6th Cir. 2018) (same).

(delayed calling ambulance for unconsciousness and vomiting); *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979) (delayed medical care for alcohol withdrawal).

The Court should reject DeWitt County's suggestion that its staff and contractors are blameless because Wennermark was provided *some* medical treatment. *Contra* Doc. 32, p. 5, ¶ 11. This is not the law. Jail staff knowingly treating a detainee incorrectly or otherwise evincing a "wanton disregard" for his serious medical needs—as DeWitt County's staff and contractors did here—is the epitome of denying a detainee their constitutional right to adequate medical care. *Carlucci*, 884 F.3d at 538; *Easter*, 467 F.3d at 464; *see also Sims v. Griffin*, 35 F.4th 945, 952 (5th Cir. 2022) (cleaning and monitoring sick inmate still unconstitutional because jail did not "address[] [the inmate's] serious medical needs—what matters under *Easter*"); *Spikes v. McVea*, 8 F.4th 428, 437 (5th Cir.), *vacated on other grounds on reh'g*, 12 F.4th 833 (5th Cir. 2021) ("[A]n official is deliberately indifferent to a prisoner's serious medical need when he delays treatment with responses so cursory or minimal that they cause unnecessary suffering.").[2]

For example, in *Austin v. Johnson*, a prisoner collapsed from dehydration but officials rendered first aid for over ninety minutes before calling an ambulance. 328 F.3d at 206. The Fifth Circuit concluded that the officials had "fair warning" it was unlawful to wait so long for an ambulance, regardless of their efforts to provide first aid, pointing to the serious known medical consequences. *Id.* at 210. Here, the consequences were likewise obvious as, even worse than the prolonged first aid in *Austin*, here the jail provided only a knowingly incorrect topical cream for

---

[2] *See also Galvan v. Calhoun Cnty.*, 719 F. App'x 372, 376 (5th Cir. 2018) (reversing summary judgment as to officer who provided over-the-counter treatment but did not bring inmate to the doctor); *Converse v. City of Kemah, Texas*, 961 F.3d 771, 779 (5th Cir. 2020) ("[T]aking some reasonable precautions does not mean the officer, on the whole, behaved reasonably."); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395–96 (5th Cir. 2000) ("[S]ome preventative measures … are not … enough to mitigate his errors and, overall, his conduct was objectively unreasonable in light of his duty not to be deliberately indifferent.").

over a month—then disobeyed a doctor's orders—so Plaintiff's diabetic ulcer continued to grow and worsen, causing harm. Doc. 23, pp. 5–12, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–71, 117–127.

Likewise, in *Harris v. Hegmann*, medical providers evaluated an inmate and determined he did not need emergency treatment, causing a week-long delay and pain. 198 F.3d 153, 155 (5th Cir. 1999). Nonetheless, that inmate's symptoms—a broken jaw—were so obviously an emergency that the Fifth Circuit reasoned that these actions amounted to ignoring him and denying treatment, so reversed summary judgment. *Id.* at 159–160. This again matches Wennermark's ordeal, where the jail dragged its feet for months, causing him to suffer needlessly and accrue permanent damage. Doc. 23, pp. 5–12, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–71, 117–127.

Having alleged constitutional violations, Plaintiff must further allege they flowed from "the execution of a county's policies or its customs" in order to state a claim against DeWitt County. *Colle v. Brazos County*, 981 F.2d 237, 244 (5th Cir. 1993). Here, Plaintiff alleges two deliberately indifferent sets of policies that, both separately and in combination, trigger county liability.

   2. *DeWitt County's practices of routinely withholding and impeding medical care for detainees in filthy cells created unconstitutional conditions of confinement.*

      a. DeWitt County has waived any argument to Plaintiff's conditions of confinement claim.

Though Plaintiff pleads both conditions of confinement and episodic act or omissions claims,[4] DeWitt County does not challenge Plaintiff's conditions of confinement claim. *Compare* Doc. 23, pp. 15, 16, ¶¶ 94–96, 98 *with* Doc. 32, p. 4, ¶¶ 7, 8 (summarizing only an episodic acts and omissions standard, and citing only such caselaw, for its *Monell* challenge). Accordingly, it has waived any argument attacking the conditions of confinement claims. *JTB Tools & Oilfield*

---

[4] *See Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452, n.1 (5th Cir. 2009) (Plaintiffs may bring constitutional challenges simultaneously alleging that a constitutional injury is the result of an episodic act or omission and conditions of confinement violated a detainee's constitutional rights.)

*Services, L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) ("To avoid waiver, a party must identify relevant legal standards" and precedents); *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 735 (5th Cir. 2018) (same); *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411, 422, n.4 (S.D. Tex. 2023) (same).

      b.   Plaintiff states a conditions of confinement claim against DeWitt County.

DeWitt County's practices of delaying and denying necessary medical attention to pre-trial detainees housed in filthy cells created unconstitutional conditions of confinement in the jail. "[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *see also Shepherd v. Dallas Cnty.*, 591 F.3d 445, 453 (5th Cir. 2009) (holding that "a *de facto* jail policy of failing properly to treat inmates with chronic illness" was an unconstitutional condition of confinement).

"[T]hree elements must be established to prove an unconstitutional condition of confinement:"

(1)   "a rule or restriction or … the existence of an identifiable intended condition or practice ... [or] that the jail official's acts or omissions were sufficiently extended or pervasive";

(2)   which was not reasonably related to a legitimate governmental objective; and

(3)   which caused the violation of [a detainee's] constitutional rights.

*Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 874 (5th Cir. 2016). Notably, unlike the standard used in the excessive force cases cited by DeWitt County, none of these elements requires a pattern of prior violations for *Monell* liability. *Id.* at 879; *see also Sims v. City of Jasper, Tex.*, 543 F.Supp.3d 428, 450 (E.D. Tex. 2021), *aff'd sub nom. Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022). Plaintiff's allegations thus satisfy these elements.

First, DeWitt County, together with its medical contractor, adopted a practice of delaying

or outright denying medical care to pretrial detainees as a matter of course. This took several forms that applied to Wennermark:

Jailers routinely denied and delayed access to care by not even taking detainees to the clinic, Doc. 23, p. 15, ¶ 94(a–b), as exemplified by multiple jailers ignoring Wennermark's obvious wound and repeated complaints for weeks. *Id.* at 5–6, ¶¶ 27–36.

Further, DeWitt County expected SHP to cut corners on necessary care, such as by improperly using intentionally incorrect over-the-counter medications to excuse further delays in actual (and more expensive) medical care. *Id.* at 13–16, ¶¶ 84–87, 94(c, j, l). In Wennermark's case, SHP and jailers intentionally provided only a cheaper over-the counter medicine that they knew would not and was not actually treating the wound, ignoring even that incorrect medicine's instructions to see a doctor after two weeks, instead continuing to provide only this "treatment" to Wennermark for over a month. *Id.* at 7–9, ¶¶ 40–43, 47–54.

This practice of denying and delaying access to care was compounded by DeWitt County's practices of housing detainees like Wennermark who were known to be more susceptible to infection or already had obvious signs of a serious infection in filthy cells and denying them cleaning products, leaving them to fester. *Id.* at 5, 12, 16, ¶¶ 24, 28, 71, 94(g).

Next, after the jail and SHP finally sent Wennermark to a doctor, they intentionally disobeyed that doctor's written orders and failed to fill his prescription, even as they watched his diabetic ulcer painfully deteriorate as a result. Doc. 23, pp. 10–11, ¶¶ 57–67. This was also characteristic of the medical care provided by the jail overall, as it was known and approved by at least five employees in the small jail. *Id.* at 10–11, 15–16, ¶¶ 59, 67, 94(l–m).

DeWitt County further placed jail security leadership in charge of intervening directly in medical conditions to deny off-site care. Doc. 23, pp. 12–16, ¶¶ 73–74, 84, 94(k). For

Wennermark, this meant that Captain Garza—not a medical provider—decided to refuse transport to the emergency room when a medical provider admitted it was necessary. *Id.* at 11, ¶¶ 68–69.

In combination, these practices and their routine use across the entire small jail—including by seven staffers for months in this incident—reflect "a *de facto* jail policy of failing properly to treat inmates with chronic illness." *Shepherd*, 591 F.3d at 453; *see also Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 209 (5th Cir. 2011) (county subject to liability for unconstitutional conditions of confinement that led to untreated detainee infections); *Colle*, 981 F.2d at 245 (county subject to liability for *de facto* policy of failing to monitor pretrial detainees' medical conditions). Thus, Plaintiff's allegations impugn "the jail's system of providing medical care to inmates with chronic illness." *Shepherd*, 591 F.3d at 453.

Second, this custom served no legitimate penological interest. *Id.* at 454 ("gross inattention to the needs of inmates with chronic illness" has no legitimate penological purpose). The amended complaint specifically alleges that, instead, the sole reason for these terrible conditions was to pinch pennies at the expense of detainees' rights to medical care. Doc. 23, pp. 12, 14–15, ¶¶ 73, 85–87, 94(c). "Constitutional rights are not, of course, confined to those available at modest cost." *Ruiz v. Estelle*, 679 F.2d 1115, 1146 (5th Cir. 1982) *amended in part, vacated in part*, 688 F.2d 266; *see also Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 304, 320 (5th Cir. 2024) (plaintiffs stated *Monell* claim based on policy of cutting costs by delaying inmate hospitalizations).

Finally, Plaintiff's allegations satisfy the third element of a condition of confinement claim, as the deficient care and deplorable conditions proximately caused Wennermark's injuries and violated his constitutional rights: The initial denial of care by jailers in January aggravated his condition and prolonged his pain for weeks, Doc. 23, pp. 6, 12, ¶¶ 33–35, 71; the intentional mistreatment with an known ineffective medicine—and then misusing even that medicine—

further caused Wennermark's wound to needlessly deteriorate and injure him for another month of delay, *id.* at 7, 9, 12, ¶¶ 40–43, 50–55, 71; the unsanitary conditions encouraged Wennermark's untreated diabetic ulcer to fester, *id.* at 5, 12, ¶¶ 24, 28, 71; disobeying the off-site doctor's written instructions for a week allowed the diabetic ulcer to progress to gangrene undetected and untreated, *id.* at 9–12, ¶¶ 55, 57–59, 66–71; and rejecting even the on-site medical provider's recommendation for transportation to the emergency room allowed that gangrene to advance further into the wound, destroying Wennermark's tissues. *Id.* at 11–12, 17, ¶¶ 68–71, 100, 103. "Given the different, compounding ways that these alleged policies might interact, a jury could reasonably conclude that they had a 'mutually enforcing effect' that deprived [Wennermark] of needed medical care." *Sanchez v. Young Cty., Texas*, 956 F.3d 785, 796 (5th Cir. 2020); *see also Wilson*, 501 U.S. at 304. As discussed above, this deprivation of and delay in providing medical care violated Wennermark's constitutional rights. *See supra* pp. 6–9.

In *Colle v. Brazos County*, the Fifth Circuit held that a county violated the Constitution where county policy interposed an off-site, untrained security official (just like Garza) between the hospital and a detainee suffering a serious medical need—like Wennermark—in that case, alcohol withdrawal. 981 F.2d at 240. The official in that case decided to wait until the next morning to arrange medical attention as the detainee suffered through the night. *Id*. But that wait was too long, and the detainee's symptoms worsened until he died. *Id*. Indeed, the facts of this case are far worse than *Colle*, as DeWitt County did not just delay twelve hours, as the jailers in *Colle* did, during Wennermark's last day of incarceration but also had delayed and then mistreated Wennermark's symptoms for two months. Doc. 23, pp. 6, 9, 12, ¶¶ 33–35, 40–43, 50–55, 57–59, 66–69. The Fifth Circuit in *Colle* reversed dismissal of *Monell* claims against that county, finding alleged policies of "inadequate monitoring of pretrial detainees which amounted to a denial of

medical care" and of vesting the only authority for medical care in an off-site supervisor "support[ed] an inference that unconstitutional county policies were the 'moving force' behind the carelessness that led to" the detainee's death in that case. *Colle*, 981 F.2d at 246. *Colle* thus requires denial of DeWitt County's motion to dismiss Plaintiff's analogous allegations.

In another similar case, *Lawson v. Dallas County*, the Fifth Circuit considered a jail whose nurse refused to provide doctor-ordered dressing changes to a mobility-impaired detainee for nine days, leading to worsening and dangerous ulcers. 286 F.3d 257, 261, 263 (5th Cir. 2002). The denied care from *Lawson* is thus highly analogous to the last week of Wennermark's detention, where the jail refused to provide his prescription and skipped most of the ordered dressing changes. Doc. 23, pp. 9–12, ¶¶ 55, 57–59, 66–71. The Fifth Circuit held that the misconduct by the jail's nurse in *Lawson* was attributable to the county because "the practices at issue in this case were consistently applied to" inmates like the plaintiff in that case—even though that plaintiff had identified no prior injuries, or even complaints, about the practices. *Id.* at 263; *see also Montano*, 842 F.3d at 871, 876, 879 (evidence from staff that they were adhering to "general staff conduct" in similar situations proved an unconstitutional condition of confinement, even though there were no prior violations found). Likewise, Plaintiff alleges he fell victim to a consistent practice of delaying and refusing care to chronically ill detainees, so he has stated a *Monell* claim akin to that in *Lawson*. Doc. 23, pp. 10–11, 15–16, ¶¶ 59, 67, 94(l–m).

c.   Plaintiff states an episodic acts or omissions claim.

Plaintiff also alleges that his denial of medical care resulted from official policy decisions made with deliberate indifference to the known risk of serious harm to prisoners by the Sheriff, satisfying the requirements of *Jauch v. Choctaw Cty, Miss.*, 874 F.3d 425, 435 (5th Cir. 2017) to allege DeWitt County is responsible for the expected results of those official policy decisions.

Doc. 23, pp. 12–16, ¶¶ 72–74, 84–85, 94, 95, 97–99. These allegations are plausible because so many staff engaged in the same misconduct, *see id.* at 5–11, ¶¶ 28–69; *Balle v. Nueces Cnty., Texas*, 952 F.3d 552, 560 (5th Cir. 2017) (can infer unwritten policy and deliberate indifference to inadequate medical care from allegations that multiple jail staff ignored obvious medical need), and because so many different jail staffers made false statements to hide the lack of care to Wennermark. Doc. 23, pp. 7, 9–10, ¶¶ 39, 56, 62–63; *Sanchez*, 956 F.3d at 793 (evidence jailers were dishonest and tried to cover up misconduct allows the inference that "such dishonesty and an apparent cover-up is 'typical of extended or pervasive misconduct.'").

Accordingly, DeWitt County jail's widespread practice of delaying and denying necessary medical care to ill and chronically ill detainees, which proximately caused the injurious delay in Wennermark's care, states a § 1983 unconstitutional conditions of confinement claim against DeWitt County. Thus, its motion to dismiss should be denied.

### 3. DeWitt County purposefully failed to train officers properly for their role in approving or denying medical recommendations for off-site care.

DeWitt County is independently liable for the constitutional violations under § 1983 due to its failures to train which proximately caused Wennermark's injuries.

"[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, n.10 (1989). Even for one constitutional violation, the Fifth Circuit has held a municipality is liable for failure to train officers when (1) the need for training "should have been obvious to" the policymaker, (2) the violation was an obvious consequence of that lack of training, and (3) the failure to train caused the constitutional violation. *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 460 (5th Cir. 2000); *see also Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) ("[E]ven absent proof of pattern, deliberate

15

indifference can still be inferred if the factfinder determines that the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy."); *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (applying the same rule). Plaintiff alleges a failure to train jail staffers on the requirement to provide detainees access to medical care; the dangers of infection, diabetic neuropathy, or other common emergency medical conditions; or otherwise in a manner that would ensure adequate care for medical conditions that exceeded the ability of the jail to treat. Doc. 23, pp. 12–13, 15, ¶¶ 73–76, 81–83, 94(d–f). For these training omissions, Plaintiff alleges facts that satisfy each of the three elements of municipal liability, even for a "single incident," in *Brown*. 219 F.3d at 460.

First, the need for training on access to medical treatment was obvious because DeWitt County placed officers in the position of deciding whether an inmate deserved medical care in the clinic at the jail, Doc. 23, pp. 5–6, 13, ¶¶ 28, 31–35, 83; as well as security officials in the position of deciding whether to authorize off-site medical care—even if on-site medical staff admit it is necessary. *Id.* at 11–16, ¶¶ 69, 73, 84, 94(k). DeWitt County's failure to provide training on detainees' access to medical care satisfies the first, key element of the single incident exception. Analogous to *Canton*, the DeWitt County policymakers knew "to a moral certainty that their [jail] officers will be required to" provide access to medical care for sick inmates who were detained and unable to care for themselves, Doc. 23, pp. 13, 16, ¶¶ 77–80, 83, 97, but DeWitt County failed to adopt any training on basic features of this obviously recurring scenario. *City of Canton, Ohio*, 489 U.S. at 390, n.10; Doc. 23, pp. 12–13, 15, ¶¶ 73–76, 81–83, 94(d–f). As a result, "the need to train officers" on their constitutional duties to provide medical care in those recurring situations "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton, Ohio*, 489 U.S. at 390, n.10.

A jail with *no* training on inmates' access to medical care is obviously deficient—particularly where jailers are required to be the gatekeepers even in medical emergencies—like the hypothetical discussed in *City of Canton* and like other cases where the Fifth Circuit has found a *Monell* claim. *Compare id. with* Doc. 23, pp. 5–6, 11–16, ¶¶ 28, 31–35, 69, 73, 83–84, 94(k); *see also Morris v. Dallas Cnty*, 960 F.Supp.2d 665, 668 (N.D. Tex. 2013) (denying summary judgment to county based on single-incident exception for its failure to train jailers how to observe and assess detainee medical needs and respond to needs where jailers acted as gatekeepers to medical care); *Brown*, 219 F.3d at 456 ("no training on arrest situations" sufficient for single incident liability); *Littell*, 894 F.3d at 620 (reversing dismissal of *Monell* claim due to "no training" on "invasive searches of students' persons").

Here, DeWitt County knew its officers would be, and routinely are, placed in recurring situations where they must decide whether to provide detainees access to medical care. Doc. 23, pp. 5–6, 11–16, ¶¶ 28, 31–35, 69, 73, 78, 83–84, 94(k). Accordingly, "the need [for DeWitt County] to train [its] officers in the constitutional limitations on the [the provision of medical care in jail] … can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390, n.10; *see also Silva v. Donley Cnty. Texas*, 32 F.3d 566, 1994 WL 442404, *5–6 (5th Cir. 1994) (lack of training on suicide prevention, combined with lack of regular cell checks and using a single deputy for dispatch and monitoring, sufficient to affirm denial summary judgment as to sheriff).[5] Thus, Plaintiff has satisfied the first, critical element of the single incident exception.

---

[5] *See also e.g.*, *Benjamin v. Baytown Police Dep't*, No. 4:17-CV-01198, 2018 WL 1033255, at *2 (S.D. Tex. Feb. 21, 2018) (denying motion to dismiss where plaintiff alleged a lack of training for officers regarding hearing aids lead officers to remove his hearing aids during booking, then to use excessive force while in jail because he appeared noncompliant with commands he could not hear).

Second, the delays and denials for Wennermark are exactly the category of constitutional violation that DeWitt County obviously risked incurring by not training its staff and contractors on the constitutional duties to provide and not to delay medical care. Doc. 23, pp. 13, 16–17, ¶¶ 77–80, 97–98; *see also Morris*, 960 F.Supp.2d at 687 (reasonable jury could find that unconstitutional denial of medical care was obvious consequence of lack of training for jailers).

Finally, because staff were not trained to provide medical care when necessary to prevent serious harm, or on their duty to provide access to off-site care when so necessary, Wennermark was denied exactly that. Doc. 23, pp. 12, 16–17, ¶¶ 71, 76, 97, 103–104. As discussed above, this violated Wennermark's constitutional rights. *See supra* pp. 6–9.

These facts are analogous to *Littell*, where the government invested the power to search any student with a person who had not been trained to limit such searches based on the Constitution. *Littell*, 894 F.3d at 626. Analogously, here, DeWitt County empowered and trained jailers to withhold access to on- and off-site medical care. Doc. 23, pp. 5–6, 11–16, ¶¶ 28, 31–35, 69, 73, 78, 83–84, 94(k). Thus, similar to the school official assigned to conduct investigations in *Littell*, DeWitt County "expected, or even intended" that jailers and jail providers would decide to withhold medical care—despite the absence of any training on the constitutional limits of this conduct. *Id.*; *see also Drake v. City of Haltom*, 106 Fed. Appx. 897, 900 (5th Cir. 2004) (reversing dismissal where alleged lack of training allegedly caused male jailers to abuse female detainees).

Accordingly, Wennermark states claims against DeWitt County under § 1983 both for its widespread unconstitutional conditions of confinement and its failures in training which were the moving force of the violations of his constitutional rights.

### B. DeWitt County discriminated against Wennermark by denying him reasonable accommodations for his disabilities and inflicting unwarranted pain.

Similarly, as to the ADA and RA claims, rather than merely alleging treatment below the

18

standard of care, the amended complaint specifically alleges that the County and its agents refused to accommodate Plaintiff's disability and intentionally inflicted disproportionate pain, suffering, and other harms because of his known disability. Doc. 23, pp. 5–12, 23–24, ¶¶ 28, 33–37, 40–54, 57–62, 64–71, 128–138. Plaintiff thus states claims for disability discrimination.

An ADA and RA plaintiff must show: (1) that he was a qualified individual within the meaning of the acts; (2) that he was excluded from, or denied benefits of, services, programs, or activities of the public entity, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.[6] *Cadena v. El Paso Cnty., Tex.*, 946 F.3d 717 (5th Cir. 2020); *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997). Regarding the third element, however, the ADA and RA additionally imposes an affirmative obligation upon public entities to make reasonable accommodations for disabled individuals. *Bennett-Nelson v. La Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citing 42 U.S.C. § 12131(2)). Thus, to state a claim for failure-to-accommodate under the ADA, Plaintiff must allege (1) Mtr. Wennermark was a qualified individual with a disability, (2) his disability and its limitations were known by the covered entity, and (3) the entity failed to make reasonable accommodations. *Ball v. LeBlanc*, 792 F.3d 584, 596, n.9 (5th Cir. 2015). The intentional denial of a necessary and reasonable accommodation constitutes intentional discrimination. *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575-76 (5th Cir. 2002).

> 1. *Wennermark was a qualified individual with a disability whose limitations were known to DeWitt County.*

It is indisputable that Wennermark had a disability: diabetes mellitus, an endocrine

---

[6] Courts interpret the ADA and RA functionally identically. *Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011); *see also Bennett-Nelson,* 431 F.3d at 454. The only significant difference is that the entity must receive federal funds to be subject to the RA, 29 U.S.C. § 794(a), which DeWitt County does. Doc. 23, pp. 2, 23, ¶¶ 4, 128.

disorder. Doc. 23, p. 24, ¶ 133. This disability made him particularly vulnerable to wounds in his extremities due to diabetic neuropathy, which also substantially impaired his sensation, healing, and immune system compared to the average person. Doc. 23, pp. 4–5, 8, 24, ¶¶ 16, 19–22, 26, 45–46, 134–135; *see also* 42 U.S.C. § 12102(1)(A), (2) (defining "disability" as an "impairment that substantially limits one or more major life activities" and explicitly including seeing, walking, standing, and the normal operations of the endocrine and immune systems within the scope of major life activities); *see also* 29 C.F.R. § Pt. 1630, App. (noting diabetes by definition is a disability); *Bridges v. City of Bossier*, 92 F.3d 329, 336, n.11 (5th Cir. 1996) ("interpretive guideline to the ADA indicates a few diseases that constitute ADA disabilities *per se* (i.e. HIV and insulin-dependent diabetes)."). DeWitt County does not dispute that Wennermark meets this threshold in its motion. *See* Doc. 32, p. 9, ¶¶ 18, 19. It is well-settled that disabled detainees in correctional facilities like the DeWitt County jail are "qualified" to access the general programs and benefits of the jail. *See Penn. Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998); *Feliz v. El Paso Cnty.*, 441 F.Supp.3d 488, 505–06 (W.D. Tex. 2020).

Further, DeWitt County was aware of Wennermark's diabetes and the limitations it imposed on him including a compromised ability to heal from wounds and walk normally and without pain once his diabetic ulcer grew. Doc. 23, pp. 5–8, 10, 21, 22, 24, ¶¶ 22, 23, 31–33, 43, 44, 61, 62, 121, 123, 124, 134, 135. DeWitt County does not argue otherwise. *See* Doc. 32, p. 9, ¶¶ 18, 19.

### 2. *DeWitt County excluded Wennermark from jail programs and services.*

DeWitt County denied or excluded Wennermark from accessing the programs and services the jail offered to non-disabled detainees, including but not limited to medical care, access to court, and safe housing. Doc. 23, pp. 24–25, ¶¶ 131, 137. Because DeWitt County did not provide Wennermark with accommodations necessary to address his diabetes and diabetic ulcer,

Wennermark suffered a painful impairment that significantly decreased his ability to access essentially all jail programs when compared to other detainees who, for example, could walk to the clinic, walk to court, walk around their cell or unit, and engage in jail recreation activities easily and without pain. Doc. 23, pp. 5–12, 23–24, ¶¶ 28, 33–37, 40–54, 57–62, 64–71, 128–138; *see also United States v. Georgia*, 546 U.S. 151, 157 (2006) ("it is quite plausible that the alleged deliberate refusal of [corrections] officials to accommodate … disability-related needs in such fundamentals as … medical care … constitute[s] exclusion from participation in or denial of benefits of the [jail's] services, programs, or activities.") (cleaned up).

### 3. *DeWitt County intentionally discriminated against Wennermark.*

Finally, DeWitt County intentionally discriminated against Wennermark in two ways: first, by refusing to provide him with reasonable accommodations that would have allowed him to have equal access to jail programs and services and, second, by inflicting pain, punishment, and suffering on him that was not imposed on non-disabled detainees.

First, Wennermark's need for accommodations for his diabetes and diabetic ulcer in the forms of medical care and sanitary living conditions was obvious, open, and apparent as he repeatedly requested these accommodations, such accommodation was eventually ordered by a doctor, and the jailers and jail staff knew he needed them. Doc. 23, pp. 5–11, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–69, 117–126; *see e.g., Phillips v. Prator*, No. 20-30110, 2021 WL 3376524, *4 (5th Cir. 2021) (need for simplified communication or getting help was an obvious accommodation for autistic child). Nonetheless, DeWitt County denied Wennermark these accommodations its staff knew were both reasonable and necessary.

Contrary to DeWitt County's assertions, courts in the Fifth Circuit routinely find that jails and prisons violate the ADA and RA when they deny reasonable accommodations that are

"medical" in nature to prisoners when those medical devices, medications, or treatments are necessary for the prisoner to otherwise have equal access to the services and programs of the jail or prison. *See, e.g.*, *Cadena v. El Paso Cnty.*, 946 F.3d 717, 726–28 (5th Cir. 2020) (reversing summary judgment for county on ADA claim where medical staff issued direction for detainee to have wheelchair to accommodate disabilities and jail staff denied it); *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. Apr. 7, 2011) (family of asthmatic prisoner who died from asthma attack stated ADA claim for failure to accommodate his disability based on denial of medication and physician appointments); *McCoy v. Tex. Dept. of Crim. Justice*, No. C-05-370, 2006 WL 2331055, *8 (S.D. Tex. Aug. 9, 2006) (denying summary judgment on ADA and RA claim where prison denied asthmatic his prescribed medications necessary for him to live and access jail's programs); *Estrada v. Director, TDCJ-CID*, No. 5:20-CV-030-BQ, 2022 WL 16919789, *8 (N.D. Tex. Nov. 14, 2022) (failure to provide the first-floor, single-cell ordered or recommended by medical professionals stated ADA claim for intentional discrimination where denial of that cell prevented him from accessing meals, medications, and commissary, and prevented him from sleeping); *Borum v. Swisher County*, No. 2:14-cv-127-J, 2014 WL 4814541, *11 (N.D. Tex. Sept. 29, 2014) (plaintiffs stated a claim under the ADA where jail "completely failed" to provide disabled inmate medical care necessary to treat his disabilities where such care was a reasonable and necessary accommodation for him to access the jail's services and programs); *Forster v. Bexar Cnty.*, No. 5:21-cv-00765-JKP-RBF, 2022 WL 2820857, *2–3, *32–33 (W.D. Tex. July 19, 2022) (jail that failed to provide mental health care including lab work to mentally ill detainee stated an ADA claim for the jail's failure to provide reasonable accommodations).

The cases cited by DeWitt County do not hold otherwise. Instead, each concerned a prisoner who did not have a disability, did not identify the programs or services they were denied

access to or how they were otherwise treated differently, or failed to allege the entity knew the medical accommodations were necessary.[7] *See Penner v. Gaines Cnty., Texas*, No. 23-10985, 2024 WL 3372674, *1 (5th Cir. July 11, 2024) (plaintiffs failed to allege prisoner was treated differently because of his disability or that the jail knew accommodations were necessary for any disability); *Hale v. Harrison Cnty. Bd. of Supervisors*, 8 F.4th 399, 404, n.† (5th Cir. 2021) (plaintiff did not have a qualifying disability and wanted a certain medical treatment that was not medically necessary according to any medical professional); *Nottingham v. Richardson*, 499 F. App'x. 368, 376-77 (5th Cir. 2012) (plaintiff complained of inadequate care for temporary illnesses, not a disability, and failed to explain how transporting him on the floor of a van was in any way connected to a disability); *Thomas v. Holmes*, No. 2:23-cv-00190, 2024 WL 4135511, *2 (S.D. Tex. Mar. 15, 2024), *report and recommendation adopted* 2024 WL 3935432 (S.D. Tex. Aug. 26, 2024) (plaintiff failed to allege how doctor's delay in prescribing a medication constituted a failure to accommodate or what programs or services he could not access during months he was without medication). In contrast to the plaintiffs in each of these cases, Plaintiff does have a qualifying disability, identifies the programs and services he was denied or provided unequal access to as a result of being denied accommodations, and alleges DeWitt County was aware of his need for these accommodations. *See supra* pp. 19–21.[8]

---

[7] As to *Bryant v. Madigan,* that court began by expressing doubt that the ADA even applies to prisoners—a holding that has subsequently been soundly rejected. *Compare* 84 F.3d 246, 248-49 (7th Cir. 1996) *with Penn. Dept. of Corrections* 524 U.S. at 210 (1998) and *United States v. Georgia*, 546 U.S. at 157. *Bryant's* utility is now limited to its discussion of the requirement that a detainee identify a program, service, or activity to which he is denied access or benefit and the summary of the kinds of temporary ailments that are not disabilities such that disagreement with their treatment sounds in medical malpractice rather than the ADA. *Bryant*, 84 F.3d at 249.

[8] DeWitt County also quotes the Supreme Court in *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 603, n.14 (1999) as stating the ADA did not impose a "standard of care" or require "certain level of benefits to individuals with disabilities" but ends the quote early—the very next sentence of the opinion states that the Court "do[es] hold, however, that States must adhere to the ADA's

Ironically, DeWitt County also cites *Cadena v. El Paso County*, except that case reversed dismissal of an ADA claim where that plaintiff mobility impaired pretrial detainee was not provided a wheelchair, causing her to fall several times and impairing her access to jail facilities. 946 F.3d at 721–22. At a minimum, Wennermark has similarly alleged DeWitt County invaded "a disabled inmate's right to mobility within a prison" as the Fifth Circuit found in *Cadena*, 946 F.3d at 724, because DeWitt County forced Wennermark to walk to court and aggravate his injury as well as denied him a wheelchair that its staff claimed he requested to access necessary medical care at least once. *See* Doc. 23, pp. 10–11, 22, ¶¶ 62, 69, 124.

Second, Plaintiff alleges ADA and RA claims based on DeWitt County's causing him substantial pain and suffering not inflicted on other non-disabled detainees. A failure to accommodate a disabled detainee that results in the detainee suffering more pain and punishment than non-disabled detainees also constitutes intentional discrimination. *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, *37 (S.D. Tex. Feb. 3, 2017); *McCoy*, No. C-05-370, 2006 WL 2231055, at *7; *see also Estrada*, No. 5:20-CV-030-BQ, 2022 WL 16919789, at *4, *7 (quoting *McCoy* and noting that plaintiff suffered pain as a result of being denied reasonable and necessary accommodations). Here, Plaintiff alleges that DeWitt County's jail providers and staff knew he required accommodations in the form of timely, correct medical treatment for his diabetic ulcer, sanitary living conditions, and mobility accommodations and not only refused to provide these but inflicted additional suffering on him by then forcing him to walk on the excruciating disability-related wound. Doc. 23, pp. 5–11, 20–25, ¶¶ 23–54, 57–69, 117–126, 134–137. Where Wennermark suffered more pain and suffering than other detainees due to the lack of reasonable

---

nondiscrimination requirement with regard to the services they in fact provide." *Id*. Thus, while the ADA may not impose a standard of care on DeWitt County, it does impose the obligation not to discriminate against persons with disabilities with the jail services it does provide.

accommodation for his disability, DeWitt County intentionally discriminated against him.

Accordingly, Plaintiff has stated ADA and RA claims for DeWitt County's failure to accommodate his disabilities and infliction of additional pain and punishment on him. The Court should deny the motion to dismiss.

### C. In the alternative, the Court should permit discovery and an opportunity to amend the Complaint before granting a Rule 12 motion.

Although the Court should deny the motion on its merits, if the Court would grant any part of DeWitt County's motion to dismiss, then Plaintiff requests in the alternative that the Court grant Plaintiff leave to amend after the benefit of limited discovery. "The court should freely give leave [to amend pleadings] when justice so requires." FED. R. CIV. P. 15(a)(2).

This case involves the policies, procedures, and history of the five officers specifically and DeWitt County broadly which are not available to Plaintiff before bringing suit. *See* TEX. GOV'T CODE § 552.108 (excepting many law-enforcement records from public disclosure). If the Court needs additional information on the subjects DeWitt County attacks—such as more specificity regarding training, practices, or prior violations—Plaintiff should not be expected to plead even more details prior to discovery. All of those subjects are only known to Defendants, at least until Plaintiff has had the opportunity to investigate through discovery. *See supra* p. 5.

Thus, at a minimum, the Court should deny DeWitt County's motion without prejudice until Plaintiff has had the opportunity to conduct discovery—specifically, written discovery to the Defendants and taking the depositions of the Sheriff, the named individual defendants, and a representative of DeWitt County under Rule 30(b)(6)—and amend the complaint.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny DeWitt County's motion to dismiss without prejudice.

Dated: January 27, 2025.

Respectfully Submitted,

**EDWARDS LAW**
603 W. 17th St.
Austin, TX 78701
Tel.  512-623-7727
Fax.  512-623-7729

By____/s/ *Jeff Edwards*_____
        JEFF EDWARDS
        State Bar No. 24014406
        jeff@edwards-law.com
        MIKE SINGLEY
        State Bar No. 00794642
        mike@edwards-law.com
        DAVID JAMES
        State Bar No. 24092572
        david@edwards-law.com
        LISA SNEAD
        State Bar No. 24062204
        lisa@edwards-law.com
        PAUL SAMUEL
        State Bar. No. 24124463
        paul@edwards-law.com

        **ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

        I certify, by my signature below, that the foregoing has been served on counsel for all parties through the Court's electronic filing system.

         /s/ Jeff Edwards_____
        Jeff Edwards