IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WENNERMARK; | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. |
| v. | § | 6:24-cv-31 |
| | § | |
| DEWITT COUNTY, et al.; | § | |
| | § | JURY DEMANDED |
| Defendants. | § | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS SOUTHERN HEALTH PARTNERS, INC.; JENNIFER STINNETT; AND LAURIE SRUBAR KIENING'S MOTION TO DISMISS

The Court should deny Defendants Southern Health Partners, Inc. (SHP); Jennifer Stinnett; and Laurie Srubar Kiening's motion to dismiss the amended complaint, Doc. 34 (and filed again as Doc. 39), as Plaintiff Christopher Wennermark has stated claims against them.

**I.    SUMMARY OF THE ARGUMENT**

The Court should deny SHP, Stinnett, and Kiening's motion to dismiss for five reasons.

First, Stinnett and Kiening violated Wennermark's constitutional rights by knowingly refusing and delaying treatment, as well as intentionally treating him incorrectly. Rather than merely providing substandard medical care, Defendants deliberately sabotaged his care. Defendants acted under color of law because they contracted to and voluntarily assumed the duty to care for pretrial detainees in DeWitt County jail. *West v. Atkins*, 487 U.S. 42, 55–56, (1988).

Second, SHP is liable as a corporate entity under § 1983. As a private corporation, SHP is vicariously liable for Stinnett and Kiening's constitutional violations. In addition, Plaintiff has alleged that SHP is liable under *Monell* for *its own* policies (not for DeWitt County policy), through SHP's *own* policymaker (not DeWitt County policymakers). These include, for example, failing

to train staff on their constitutional obligations, not adopting any standing delegated orders, and adhering to a widespread custom of denying necessary medical care for pretrial detainees.

Third, Plaintiff states Americans with Disabilities Act (ADA) and Rehabilitation Act (RA) claims against SHP. Despite knowing he suffered a growing diabetic ulcer that required accommodations for him to access the jail's programs and services, SHP withheld these accommodations, thereby excluding him and also unreasonably inflicting more pain on Wennermark than on non-disabled detainees.

Fourth, SHP, Stinnett, and Kiening each admit the complaint states a state law negligence claim against them. Doc. 34, p. 9.

Finally, in the alternative, to the extent the Court requires more detailed pleadings on SHP, Stinnett, or Kiening's liability, it should authorize Wennermark to further amend his complaint after he has obtained discovery relating to his claims against these Defendants.

Accordingly, the Court should deny SHP, Stinnett, and Kiening's motion to dismiss.

## II.    STATEMENT OF FACTS

Plaintiff Wennermark brings this § 1983, ADA, RA, and state law case arising from his mistreatment in DeWitt County jail. Doc. 23.

After his arrest and detention on October 1, 2022, Wennermark's heel was injured in the jail in approximately January 2023. Doc. 23, p. 5, ¶ 25.

As jail medical providers who personally interacted with Wennermark, Stinnett and Kiening knew Wennermark suffered from severe, insulin-dependent diabetes—a well-recognized disability—that, in his case, included complications like neuropathy and retinopathy that impaired his senses of touch and sight. Doc. 23, pp. 4–5, ¶¶ 16, 19–23, 26.

In a January 1, 2023 grievance, Wennermark sought access to a doctor, but he was refused.

Doc. 23, p. 5, ¶ 28. Due to the lack of this accommodation, Wennermark's wound grew in size and discoloration into an obvious diabetic ulcer. Doc. 23, pp. 5–6, 7–8, ¶¶ 25, 27, 29, 44–45.

On February 6, 2024, Stinnett agreed to assess Wennermark's injury because Wennermark's sister emailed ranking jailers to complain. Doc. 23, pp. 6–7, ¶¶ 36–40.

Unfortunately, Stinnett, with Kiening's personal approval, gave Wennermark only an over-the-counter athlete's foot cream which they knew would do nothing for Wennermark's obviously infected diabetic ulcer. *Id.* at 7, ¶ 40. Athlete's foot cream obviously cannot treat an infected wound, so Stinnett and Kiening knew this "care" was ineffective (and intentionally incorrect). *Id.* at 7–8, ¶¶ 41–42, 52. They also knew this because they saw the infection continue to visibly worsen. *Id.* at 7–9, ¶¶ 43, 47, 49–51. Nonetheless—rather than provide actual medical treatment such as antibiotics or transfer to an outside provider—athlete's foot cream was the only "treatment" provided for over a month. Doc. 23, pp. 8–9, ¶¶ 48–51, 54. (This delay also misused the cream, which instructs to see a doctor if symptoms do not improve in two weeks. *Id.* at 9, ¶ 53.)

On March 8, 2023, Kiening finally sent Wennermark to see a podiatrist. Doc. 23, p. 9, ¶ 55. The podiatrist prescribed antibiotics and daily dressing changes, as both were necessary to treat the diabetic ulcer and accommodate Wennermark's disability. *Id.* at 9–10, ¶¶ 56–57. Both Stinnett and Kiening received these directions and were responsible for following them. *Id*., p. 9, ¶ 57.

Yet Stinnett and Kiening intentionally disregarded these written orders—Wennermark was never given the antibiotics and they changed his dressing only twice in seven days. *Id.* at 10, 11, ¶¶ 59, 65. On one occasion, Stinnett claimed that she withheld the dressing change because a jailer (falsely) told her Wennermark refused treatment unless he was allowed a wheelchair to reach the clinic. *Id.* at 10, ¶ 62. Though Stinnett could have seen Wennermark in his cell or provided a wheelchair, each an obviously reasonable accommodation for his disability, she refused both; thus,

she intentionally withheld doctor-ordered dressing changes for his diabetic ulcer. *Id*. at 10, ¶ 61.

As a result of Kiening and Stinnett intentionally disobeying the doctor's orders, Wennermark's diabetic ulcer continued to grow and to smell worse and worse—which both of them personally saw, smelled, and understood to be a medical emergency. *Id*. at 11, ¶¶ 66–67.

On March 14, 2023, Stinnett admitted to Defendant Captain Jerry Garza that Wennermark needed to be sent to the emergency room for the wound in his foot, but still did not send him. Doc. 23, p. 11, ¶ 68. Instead, Stinnett, Garza, and another jailer forced Wennermark to walk the length of a city block and climb stairs on his foot to get to court, inflicting severe pain and causing further injury. *Id.* at 11, ¶ 69. The jail finally released Wennermark on March 15, 2023 and he immediately went to the emergency room. *Id.* at 11, ¶ 70. By that point, Kiening and Stinnett's misconduct and discrimination, together with the jail conditions and jailers' misconduct, had caused his diabetic ulcer to progress to severe gangrene, which required multiple surgeries and permanently impaired his mobility. *Id.* at 11–12, 17, ¶¶ 70–71, 104.

Stinnett and Kiening's mistreatment of Wennermark arose from Defendant Southern Health Partners (SHP)'s delay and denial tactics which it used in order to save money. Doc. 23, pp. 13–14, 16, ¶¶ 84, 87–89, 94(l). DeWitt County contracted with SHP, who employed Stinnett and Kiening, to save the County money by understaffing the jail clinic; withholding care from inmates; intentionally providing cheaper incorrect treatments; and delaying, limiting, and outright refusing off-site transportation to qualified medical providers. *Id.* at 14, 17–18, ¶¶ 89, 105(m–l). SHP further had no training, including no standing delegated orders, on basic functions including recordkeeping and wound care, further impairing inmates' access to necessary care. *Id.* at 14–15, 17–18, ¶¶ 91, 105(d–f). These practices even extended to the recurring scenario of receiving time-sensitive doctors' orders and prescriptions necessary to prevent serious harm from a detainee's

medical condition such that these orders were intentionally disregarded. Doc. 23, pp. 15–16, ¶ 94(l–m). Despite knowing of these practices and their likelihood of dire consequences to detainees like Wennermark, SHP's corporate policymakers approved of and continued to tolerate them. *Id.* at 14–15, 18–19, ¶¶ 89–90, 92–93, 106–113. These same practices also served to deny Wennermark necessary and prescribed accommodations for his disability. *Id.* at 25, ¶ 138.

## III. LEGAL STANDARD

In evaluating a 12(b)(6) motion to dismiss, the Court "construe[s] facts in the light most favorable to the nonmoving party, as a motion to dismiss under 12(b)(6) is viewed with disfavor and is rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (internal quotation marks omitted). "[T]he complaint need not articulate detailed factual allegations," but they must be plausible. *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (internal quotation marks omitted). Allegations are plausible when their factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

A civil rights plaintiff cannot plead, and is not required to plead, facts "peculiarly within the knowledge of defendants." *Schultea v. Wood*, 47 F.3d 1427, 1434 (5th Cir. 1995). Moreover, in a *Monell* claim "it is exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Bright v. City of Killeen, Texas*, No. 6:20-CV-431, 2021 WL 1226560, at *4 (W.D. Tex. Mar. 31, 2021) (internal quotation marks omitted). Thus, "only minimal factual allegations should be required at the motion to dismiss stage" and the plaintiff "may be more general" in describing the challenged policies, practices, patterns, and training (or lack thereof). *Thomas v. City of Galveston*, 800 F. Supp. 2d 826, 842-43 (S.D. Tex. 2011); *see also Booth v. Galveston Cnty.*, 352 F. Supp. 3d 718, 747 (S.D. Tex. 2019); *Brown v. City of Houston*, 297 F.

Supp. 3d 748, 766 (S.D. Tex. 2017); *Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. Oct. 6, 2017).

IV.   **ARGUMENT**

The Court should deny Defendants Southern Health Partners (SHP), Jennifer Stinnett, and Laurie Kiening's motion to dismiss for five reasons.

### A. Stinnett and Kiening violated Plaintiff Wennermark's constitutional right to adequate medical care in jail.

Stinnett and Kiening violated Wennermark's constitutional rights. Pretrial detainees are protected from "deliberate indifference" to their serious "medical needs." *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003). "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "The mere delay of medical care can also constitute an Eighth Amendment violation … if there has been deliberate indifference that results in substantial harm." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

Specifically, a jail medical provider is liable upon "a showing that the [jail medical provider] was subjectively aware of the risk of serious harm to the inmate" and that the provider then "disregards [the] excessive risk." *See Easter*, 467 F.3d at 463. The Fifth Circuit applies an Eighth Amendment standard to both jail and prison claims. *See, e.g.*, *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001); *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419, n.4 (5th Cir. 2017).[1] This cause of action extends to private contract medical providers. *West v. Atkins*, 487

---

[1] Although this distinction is not relevant at this stage because Plaintiff alleges subjective knowledge and deliberate indifference, *see, e.g.*, Doc. 23, p. 20, ¶ 117, the Fifth Circuit's precedent is incorrect. Pretrial detainees are protected from objectively unreasonable denial of medical care by the Fourteenth Amendment, even without subjective deliberate indifference. *See Kingsley v.*

U.S. 42, 55–56 (1988) (private prison doctor voluntarily assumed "constitutional duty to provide adequate medical treatment to" prisoners by contracting with prison).

Just like the doctor in *West v. Atkins*, here, Stinnett and Kiening acted under color of law because they agreed to serve as medical staff at the DeWitt County jail. Doc. 23, pp. 3, 13, 19, ¶¶ 11, 13–14, 84, 108. "Here, there is no question that [each defendant], as a medical professional treating a pretrial detainee on behalf of a governmental entity, was acting under color of state law for purposes of § 1983." *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021) (reversing dismissal of claims against private contract medical provider); *see also Mathis v. Sw. Corr., LLC*, No. 5:20CV146-RWS-JBB, 2023 WL 11819565, at *11 (E.D. Tex. Feb. 7, 2023).

Stinnett and Kiening specifically knew and chose to disregard a substantial risk of serious harm to Wennermark when they each intentionally refused and delayed the medical treatment they each knew he needed. These refusals and delays included giving him foot cream that they each knew would not treat his diabetic ulcer, misusing even that incorrect medicine, refusing to administer prescribed medications and dressing changes, refusing to send him to an emergency room despite knowing it was necessary, and ignoring his complaints. *See* Doc. 23, pp. 5–11, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–69, 117–126. As a result of these intentionally incorrect treatments, delays, and violations of doctor's orders, Plaintiff had to take himself to the ER upon his release and suffered gangrene which did permanent damage. *Id.* at 11–12, 23, ¶¶ 70–71, 127.

Stinnett and Kiening denying and delaying Wennermark treatment, ignoring his complaints, and knowingly treating him incorrectly violated Wennermark's constitutional rights.

---

*Hendrickson*, 576 U.S. 389 (2015) (applying *objective* standard to pre-trial detainee's excessive force claims); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2nd Cir. 2017) (extending *Kingsley* to medical care); *Hardeman v. Curran*, 933 F.3d 816, 823 (7th Cir. 2019) (same); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (same); *Colbruno v. Kessler*, 928 F.3d 1155, 1161–63 (10th Cir. 2019) (same); *Richmond v. Huq*, 885 F.3d 928, 938, n.3 (6th Cir. 2018) (same).

*See Carlucci v. Chapa*, 884 F.3d 534, 538 (5th Cir. 2018); *see, also e.g.*, *Lawson v. Dallas Cnty.*, 286 F.3d 257, 263 (5th Cir. 2002) (constitutional rights violated by disobeying doctors' orders to change dressing); *Easte*r, 467 F.3d at 463–466 (delaying access to heart medication); *Kelson v. Clark*, 1 F.4th 411, 418–19, 421 (5th Cir. 2021) (not treating visible head injury); *Brown v. Strain*, 663 F.3d 245, 250 (5th Cir. 2011) (delayed calling ambulance for drug overdose); *U.S. v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006) *abrogated on other grounds by U.S. v. Vargas-Ocampo*, 747 F.3d 299, 300 (5th Cir. 2014) (en banc) (delayed treatment for spinal injury); *Austin*, 328 F.3d at 210 (delayed calling ambulance for unconsciousness and vomiting); *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979) (delayed medical care for alcohol withdrawal).

The Court should reject Defendants' conclusory suggestion that they merely engaged in medical malpractice or that Wennermark merely disagrees with the "care" he received. *Contra* Doc. 34, p. 9. This misstates the complaint. Wennermark does not just allege that what Kiening and Stinnett did was bad medicine, but also that they both *knew* it was incorrect, *knew* they were harming Wennermark, and continued to harm him anyway. Doc. 23, pp. 5–12, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–71, 117–127. This conduct plainly violated Wennermark's constitutional rights, not just the standard of care. *See Carlucci*, 884 F.3d at 538; *Easter*, 467 F.3d at 464; *see also Sims v. Griffin*, 35 F.4th 945, 952 (5th Cir. 2022) (cleaning and monitoring sick inmate still unconstitutional because jail did not "address[] [the inmate's] serious medical needs—what matters under *Easter*"); *Spikes v. McVea*, 8 F.4th 428, 437 (5th Cir.), *vacated on other grounds on reh'g*, 12 F.4th 833 (5th Cir. 2021) ("[A]n official is deliberately indifferent to a prisoner's serious medical need when he delays treatment with responses so cursory or minimal that they cause unnecessary suffering."); *Galvan v. Calhoun Cnty.*, 719 F. App'x 372, 376 (5th Cir. 2018) (officer violated Constitution to provide over-the-counter treatment but not bring inmate to the doctor).

For example, in *Harris v. Hegmann*, an inmate had just had oral surgery and complained of pain, so jail medical providers evaluated him, determined he did not need emergency treatment, and so made him wait for a routine follow up appointment one week later. 198 F.3d 153, 155 (5th Cir. 1999). The inmate alleged he had a broken jaw the entire time, so the jail providers' evaluation was obviously incorrect. *Id.* The Fifth Circuit agreed that this was not merely negligent, but stated a claim for ignoring him and denying treatment, so reversed dismissal. *Id.* at 159–160. This matches Wennermark's ordeal, where Stinnett and Kiening each repeatedly saw his obvious and alarming symptoms but dragged their feet for months, causing him to suffer needlessly and accrue permanent damage. Doc. 23, pp. 5–12, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–71, 117–127.

In contrast, Defendants cite inapposite cases where the medical providers were not allegedly faced with obvious symptoms of a risk of serious harm and did not engage in intentionally incorrect treatment. In *Domino v. Texas Dept. of Criminal Justice*, the Court held that where an inmate's mental health symptoms remained unchanged for a long period of time, and under regular monitoring by providers, his risk of suicide was not sufficiently obvious to infer deliberate indifference. 239 F.3d 752, 756 (5th Cir. 2001). Both *Norton v. Dimazana* and *Brown v. Crowe* are even further afield, as in both cases the medical record directly contradicted nearly all of each plaintiff's allegations and each offered no evidence of intentional mistreatment. *Norton*, 122 F.3d 286, 292 (5th Cir. 1997); *Brown*, No. 7:17-cv-96, 2018 WL 4922448, *5 (N.D. Tex. 2018). *Gibson v. Collier* appears to be completely unrelated, as the Court held that the lack of universal acceptance for the necessity of sex reassignment surgery precluded the finding that denying it could be deliberately indifferent. 920 F.3d 212, 220 (5th Cir. 2019). Neither these decisions nor Stinnett and Kiening's briefing address their alleged conduct of knowingly ignoring Wennermark's obviously serious symptoms, intentionally treating him with medicine they knew

9

was incorrect and intentionally violating that medicine's instructions, intentionally failing to follow a doctor's orders, and not sending him to the emergency room even after they admitted it was necessary. Doc. 23, pp. 5–12, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–71, 117–127.

Accordingly, Plaintiff states claims against Stinnett and Kiening for their deliberate indifference, so the Court should deny their motion to dismiss.

**B.  Southern Health Partners is liable for its employees' constitutional violations.**

Southern Health Partners (SHP) fundamentally misstates the law governing its responsibilities as a private contract jail medical provider. SHP is liable under § 1983 two reasons.

*1.  SHP, a private corporation, is vicariously liable for its employees' constitutional violations.*

Contrary to SHP's briefing, although the government's § 1983 liability is limited by the framework of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 701 (1978), SHP is not a governmental entity—it is a private company which employed Stinnett and Kiening to perform the government function of jail medical care. Doc. 23, p. 2, ¶¶ 10, 11, 13. Thus, SHP is vicariously liable for their constitutional violations. *Id.* at 26, ¶ 142.

Neither the Supreme Court nor the Fifth Circuit has examined whether *Monell* is the only way to hold private corporations liable under § 1983. *See Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) (noting that the Fifth Circuit has "never squarely decided whether plaintiffs can hold private defendants vicariously liable under § 1983," and declining to reach the question). When SHP attempted to argue this issue before a different federal district court, it lost, as that court held "private prison contractors can be held vicariously liable for constitutional violations committed by employees while acting within the course and scope of their employment." *Belknap v. Leon Cnty., Tex.*, No. 622CV01028ADAJCM, 2023 WL 3604728, at *8 (W.D. Tex. Apr. 3, 2023) (Manske, Mag. J.), *report and recommendation adopted*, No.

622CV01028ADAJCM, 2023 WL 3612345 (W.D. Tex. May 23, 2023) (Albright, J.) (denying SHP's motion to dismiss). Indeed, another Texas district court has also held "neither *Monell* nor its progeny can be read to shield private corporations from vicarious liability when their employees have committed a § 1983 violation while acting within the scope of their employment." *Hutchison v. Brookshire Bros., Ltd.*, 284 F. Supp. 2d 459, 473 (E.D. Tex. 2003). *Monell* instead focused specifically upon tension between the state's police power and *respondeat superior* liability—a tension which is not present for a private company. *Id.*; *see Monell*, 436 U.S. at 692–695.

Accordingly, the Court need not undertake the *Monell* analysis as to SHP, as it is vicariously liable for the alleged constitutional violations by Stinnett and Kiening.

### 2.  *SHP is also liable under* Monell *for its official corporate policies.*

Plaintiff has independently alleged SHP is liable under a *Monell* theory of responsibility, and SHP's arguments to the contrary are incorrect, for five reasons.

> a) <u>Plaintiff has properly pleaded that SHP acts, and is therefore liable, through the official acts of its own corporate policymaker.</u>

Plaintiff's allegations concerning the policymaker for the *Monell* theory of SHP's liability are more than adequate to state a *Monell* claim for four reasons.

First, Plaintiff has alleged that SHP's corporate policymakers enacted official decisions which caused the constitutional violations. This is the correct approach according to the plain language of *Monell* and its progeny, as the function of the final policymaker concept is to ensure the entity is only liable for decisions that are officially adopted by that entity. *Monell*, 436 U.S. at 692–695. That is, decisions which can be fairly attributed to the entity itself, not just its subordinates or employees. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, n.10 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). Applying this concept to a private corporation usually means that the corporation's executives are final policymakers.

In *Auster Oil & Gas Inc. v. Stream II*, the Fifth Circuit applied *Monell*[2] to § 1983 claims against a private corporation. 835 F.2d 597, 601–02 (5th Cir. 1988). In that case, a plaintiff sued a corporation and a Louisiana State Trooper for interfering with the plaintiff's mineral rights. *Auster Oil & Gas, Inc. v. Stream I*, 764 F.2d 381, 385 (5th Cir. 1985). The plaintiff asserted a § 1983 claim for unlawful search under the Fourth Amendment because the corporation had convinced and worked together with the trooper to place tracking devices in the plaintiff's oil wells. *Id.* at 387–88. This caused physical damage when the tracking devices got stuck throughout the wellhead and pipeline. *Auster Oil & Gas Inc. II*, 835 F.2d at 599. At trial, the trooper was granted qualified immunity while the company was held liable. *Id*. On appeal, the Fifth Circuit assumed that the corporation could only be liable under *Monell*, and, in the *Monell* analysis, the Fifth Circuit held that the private corporation's vice-president's actions "constitute the official imprimatur needed to hold the corporation liable under § 1983." *Id.* at 601–02, n.3. Since the corporation's vice president had agreed to the plan to insert the tracking devices, the verdict finding the corporation liable was affirmed. *Id.* at 602, 605. Notably, *nowhere* in the Fifth Circuit's analysis did it consider the final policymaker for the Louisiana State Police, which employed the trooper—instead, the only policymaker that mattered was the policymaker *for the corporation*. *See generally id.* at 601–602. Thus, SHP's argument that DeWitt County sheriff is necessarily the policymaker for SHP, or that SHP must be the policymaker for DeWitt County in order to be liable, conflicts with the reasoning of *Monell*, as well as the express holding of binding precedent in *Auster Oil & Gas Inc. II*.

Second, SHP's contrary argument flows from its fundamental misreading of caselaw which

---

[2] Specifically, the Fifth Circuit's decision in *Auster Oil & Gas Inc. II* cited *Monell* and used the principle that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," which it extended to hold a corporation liable for a single decision of a corporate policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

says nothing about whether a private corporation can be liable under § 1983 for its subordinates' unconstitutional conduct.

SHP mistakenly cites *Bass v. Parkwood Hosp.*, 180 F.3d 234 (5th Cir. 1999) and *Gordon v. Neugebauer*, 57 F. Supp. 3d 766 (N.D. Tex. 2014) for the proposition that a person "who is not an official policymaker cannot be bound under § 1983," except neither decision stands for that principle and, indeed, that is simply not the law. Doc. 34, p. 5.[3] Both *Bass* and *Gordon* rejected § 1983 claims against private healthcare providers who were involved in exercising the civil involuntary commitment process for a mentally ill person to be detained for their own safety. *Bass*, 108 F.3d at 241; *Gordon*, 57 F. Supp. 3d at 773. Both courts found that those private entities were not state actors—i.e., they did not act "under color of law"—since they only availed themselves of the generally available legal process. *Id.* As discussed above, Plaintiff easily clears the "under color of law" hurdle because binding precedent holds that private jail medical providers, such as SHP and its employees, act under color of law—unlike private providers engaged in the civil commitment process whose conduct is merely generally permitted by statute, these jail providers are working at the behest of DeWitt County with specific authority granted by the government. *See West v. Atkins*, 487 U.S. at 55–56 (private prison doctor acted under color of law); *Sanchez*, 995 F.3d at 466 (reversing dismissal of claims against private contract medical provider as they acted under color of law); *see supra* pp. 6–7. Moreover, unlike *Auster Oil & Gas Inc. II*, both *Bass* and *Gordon* are silent on the *Monell* test for liability of private corporations.

Next, SHP misstates *Cnty. Of El Paso v. Dorado*, a Texas state court decision, in the

---

[3] If Defendants were correct that only policymakers could be liable under § 1983, then that would overturn decades of binding precedents. *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 399 (1989) (reversing dismissal of excessive force claims against individual police officer, rather than as to the police chief or mayor of the city who employed that officer).

motion's incorrect argument that "to maintain a *Monell* claim against Dr. Brock, the plaintiff 'had the burden of establishing that the policymaker [at the Detention Center] was other than the Sheriff for the County of El Paso.'" Doc. 34, p. 5 (purporting to quote 180 S.W.3d 854, 870 (Tex. App.—El Paso 2005). That misreads *Dorado*. "Dr. Brock" was not the defendant for whom the burden refers to in that sentence from *Dorado*. Contrary to SHP's briefing, those plaintiffs did not sue "Dr. Brock." *Dorado*, 180 S.W.3d at 859–60. Instead, the sole defendant in that case was the county, so the issue was whether or not *the county* could be held directly liable for Dr. Brock's conduct (or prove his conduct was officially authorized by the policymaker). *Id.* at 870. Here, the question is whether *SHP* can be liable for the acts of *its* policymakers—not whether SHP was DeWitt County's policymaker—so *Dorado* is not relevant to this case.

SHP also cites *Baughman v. Garcia*, 254 F.Supp.3d 848 (S.D. Tex. 2017) for the proposition that "[t]he identity of the final policymaker is a question of law." Doc. 34, p. 5. This is also misleading because *Baughman* noted this proposition for *county* liability—not the liability of a private contractor. *Baughman*, 254 F.Supp.3d at 886–87 ("*Where municipal liability is concerned*, however, the identity of the final policymaker is a question of law") (emphasis added, internal quotation marks omitted). *Baughman* did not address the context of *private corporate* liability—which does not look to state law. *See Auster Oil & Gas Inc. II*, 835 F.2d at 601–602, n.3.

Third, even if Defendants' reading of the law were correct—and it is not—SHP's criticism surrounding final policymaking authority is irrelevant at this stage. A "plaintiff is not required to single out the specific policymaker in his complaint; instead, a plaintiff need only plead facts that show the defendant or defendants acted pursuant to a specific official policy, which was promulgated or ratified by the legally authorized policymaker." *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 282 (5th Cir. 2016). Plaintiff has done so here by alleging that SHP's corporate final policymaker expressly adopted policies of cutting costs by failing to provide adequate care, follow

discharge instructions, and provide necessary off-site care. Doc. 23, p. 14–15, 17–19, ¶¶ 89–90, 92, 105–107. SHP's corporate final policymaker also failed to train staff with any standard operating procedures and failed to train staff on the treatment of diabetic ulcers, infections, or medical conditions requiring off-site treatment. *Id*. at 14–15, 17–18, ¶¶ 91, 105(d–f). Stinnett and Kiening acted pursuant to and consistent with these policies when they intentionally delayed Wennermark from receiving obviously necessary care, ignored Wennermark's complaints, intentionally treated him with a medication they knew would not treat his serious infection, did not follow even that medication's directions, and deliberately disobeyed a doctor's orders. *Id.* at 15, 19–20, ¶¶ 93, 111, 114. The fact that Plaintiff need not plead a policymaker's identity is particularly important because SHP may yet *be* the final policymaker for DeWitt County's on-site medical services, as the complaint supports the inference that this function was wholly delegated by the sheriff. *Id.* at 13–16, ¶¶ 84–85, 94(l) (DeWitt County sheriff hired SHP and approved SHP's policies); *see, e.g.*, *Moore*, 41 F.4th at 510–512 (5th Cir. 2022) (where city delegated policymaking authority for jail to private corporation, and corporation delegated it to the warden, both the city *and* the private corporation are liable for warden's deliberately indifferent official decisions).

This permissive pleading principle further distinguishes the decisions SHP cites, which are summary judgment cases and thus their insistence upon evidence is inapplicable at the pleading stage. *Baughman*, 254 F.Supp.3d at 887 (relying on deposition testimony to find sheriff had not delegated policymaking power to dentists, as they still reported up the chain of command and could only recommend policy changes); *Dorado*, 180 S.W.3d at 854 (relying on contract language to find no evidence sheriff had delegated policymaking authority). The Fifth Circuit is consistently critical of defendants arguing that cases determined on summary judgment or reviewing jury

verdicts support dismissal at this earlier stage.[4] *See Converse v. City of Kemah, Texas*, 961 F.3d 771, 776 n.3 (5th Cir. 2020) (citing *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 629 n. 8 (5th Cir. 2018), *Drake v. City of Holtom City*, 106 Fed.App'x 897, 900 (5th Cir. 2004)).

Finally, if the sheriff is ultimately shown to be SHP's final policymaker with respect to medical care at DeWitt County jail, he allegedly acted with deliberate indifference as discussed in Plaintiff's separate response to DeWitt County's motion to dismiss. *See* Doc. 40, pp. 6–18.

Thus, Plaintiff's complaint properly alleges deliberate indifference by SHP's policymakers and the Court should reject SHP's misguided arguments surrounding the identity of the final policymaker for the purposes of its *Monell* liability, as they are both incorrect and irrelevant.

    b)  <u>SHP has waived any argument on the conditions of confinement claims.</u>

Though Plaintiff pleads both conditions of confinement and episodic act or omissions claims, SHP does not cite any authority concerning conditions of confinement claims or articulate any argument relating to the standard for such claims. *Compare* Doc. 23, pp. 17–19, ¶¶ 105–17, 110 *with* Doc. 34, p. 7–8 (summarizing only an episodic acts and omissions standard, citing only such caselaw, and relying on that standard for argument, for its *Monell* challenge); *see Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452, n.1 (5th Cir. 2009) (episodic act or omissions claims may be brought simultaneously with conditions of confinement claims). Accordingly, SHP has waived any argument attacking the conditions of confinement claims. *JTB Tools & Oilfield Services, L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) ("To avoid waiver, a party must identify relevant legal standards" and precedents); *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 735 (5th Cir. 2018) (same); *ADR Int'l Ltd. v. Inst. for Supply*

---

[4] Plaintiffs, however, can rely on cases decided on summary judgment since cases that survive the higher summary judgment threshold can illustrate that this case clears the lower threshold at the pleading stage. *See Converse*, 961 F.3d at 776, n.3.

*Mgmt. Inc.*, 667 F. Supp. 3d 411, 422, n.4 (S.D. Tex. 2023) (same).

c) <u>SHP is liable for creating unconstitutional conditions of confinement.</u>

SHP's practices of delaying and denying necessary medical attention to pre-trial detainees created unconstitutional conditions of confinement in the jail. "[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates." *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *see also Shepherd*, 591 F.3d at 453 (5th Cir. 2009) (holding that "a *de facto* jail policy of failing properly to treat inmates with chronic illness" was an unconstitutional condition of confinement).

"[T]hree elements must be established to prove an unconstitutional condition of confinement:"

(1) "a rule or restriction or … the existence of an identifiable intended condition or practice ... [or] that the jail official's acts or omissions were sufficiently extended or pervasive";
(2) which was not reasonably related to a legitimate governmental objective; and
(3) which caused the violation of [a detainee's] constitutional rights.

*Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 874 (5th Cir. 2016). Notably, unlike the standard used in the episodic acts and omissions cases cited by SHP, none of these elements requires a pattern of prior violations for *Monell* liability. *Id.* at 879; *see also Sims v. City of Jasper, Tex.*, 543 F.Supp.3d 428, 450 (E.D. Tex. 2021), *aff'd sub nom. Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2022). Plaintiff's allegations thus satisfy these elements.

First, SHP adopted a practice of delaying or outright denying medical care to pretrial detainees as a matter of course. This took several forms that applied to Wennermark:

SHP deliberately cut corners on necessary care, such as by understaffing the clinic and improperly using intentionally incorrect over-the-counter medications to excuse further delays in

17

actual (and more expensive) medical care. *Id.* at 13–15, 17–18, ¶¶ 84, 87–89, 92–93, 105(c, i, l, m). In Wennermark's case, SHP intentionally provided only a cheaper over-the counter medicine that they knew would not and was not actually treating the wound, ignored even that incorrect medicine's instructions to see a doctor after two weeks, and instead continued to provide only this "treatment" to Wennermark for over a month. *Id.* at 7–9, ¶¶ 40–43, 47–54.

Next, after SHP finally sent Wennermark to a doctor, they intentionally disobeyed that doctor's written orders and failed to fill his prescription, even as they watched his diabetic ulcer painfully deteriorate as a result. Doc. 23, pp. 10–11, ¶¶ 57–67. This was also characteristic of the medical care provided by the jail overall, as it was known and approved by not just Stinnett and Kiening, but also at least five employees in the small jail. *Id.* at 10–11, 15–16, ¶¶ 59, 67, 105(j–k).

In combination, the routine misbehavior across the entire small jail for months by two medical providers and five jailers reflects "a *de facto* jail policy of failing properly to treat inmates with chronic illness." *Shepherd*, 591 F.3d at 453; *see also Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 209 (5th Cir. 2011) (county subject to liability for unconstitutional conditions of confinement that led to untreated detainee infections); *Colle*, 981 F.2d at 245 (county subject to liability for *de facto* policy of failing to monitor pretrial detainees' medical conditions). Thus, Plaintiff's allegations impugn "the jail's system of providing medical care to inmates with chronic illness." *Shepherd*, 591 F.3d at 453.

Second, SHP's custom served no legitimate penological interest. *Id.* at 454 ("gross inattention to the needs of inmates with chronic illness" has no legitimate penological purpose). The amended complaint specifically alleges that, instead, the sole reason for these terrible conditions was to pinch pennies at the expense of detainees' rights to medical care. Doc. 23, pp. 12, 14–15, 17–18, ¶¶ 73, 85–87, 105(c). "Constitutional rights are not, of course, confined to those

18

available at modest cost." *Ruiz v. Estelle*, 679 F.2d 1115, 1146 (5th Cir. 1982) *amended in part, vacated in part*, 688 F.2d 266; *see also Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 304, 320 (5th Cir. 2024) (*Monell* claim based on policy of cutting costs by delaying inmate hospitalizations).

Finally, Plaintiff's allegations satisfy the third element of a condition of confinement claim, as the deficient care and deplorable conditions proximately caused Wennermark's injuries and violated his constitutional rights: The initial denial of care in January aggravated his condition and prolonged his pain for weeks, Doc. 23, pp. 6, 12, ¶¶ 33–35, 71; the intentional mistreatment with a known ineffective medicine—and then misusing even that medicine—further caused Wennermark's wound to needlessly deteriorate and injure him for another month of delay, *id.* at 7, 9, 12, ¶¶ 40–43, 50–55, 71; and disobeying the off-site doctor's written instructions for a week allowed the diabetic ulcer to progress to gangrene undetected and untreated, *id.* at 9–12, ¶¶ 55, 57–59, 66–71, 100, 103. "Given the different, compounding ways that these alleged policies might interact, a jury could reasonably conclude that they had a 'mutually enforcing effect' that deprived [Wennermark] of needed medical care." *Sanchez v. Young Cty., Texas*, 956 F.3d 785, 796 (5th Cir. 2020); *see also Wilson*, 501 U.S. at 304. As discussed above, this deprivation of and delay in providing medical care violated Wennermark's constitutional rights. *See supra* at pp. 6–10.

In a similar case, *Lawson v. Dallas County*, the Fifth Circuit considered a jail whose nurse refused to provide doctor-ordered dressing changes to a mobility-impaired detainee for nine days, leading to worsening and dangerous ulcers. 286 F.3d 257, 261, 263 (5th Cir. 2002). The denied care from *Lawson* is thus highly analogous to the last week of Wennermark's detention, where Stinnett and Kiening, on SHP's behalf, refused to provide his prescription and skipped most of the ordered dressing changes. Doc. 23, pp. 9–12, ¶¶ 55, 57–59, 66–71. The Fifth Circuit held that the misconduct by the jail's nurse in *Lawson* was attributable to the county because "the practices at

issue in this case were consistently applied to" inmates like the plaintiff in that case—even though that plaintiff had identified no prior injuries, or even complaints, about the practices. *Id.* at 263; *see also Montano*, 842 F.3d at 871, 876, 879 (evidence from staff that they were adhering to "general staff conduct" in similar situations proved an unconstitutional condition of confinement, even though there were no prior violations found).[6] Likewise, Plaintiff alleges he fell victim to SHP's consistent practice of delaying and refusing care to chronically ill detainees, so he has stated a *Monell* claim akin to that in *Lawson*. Doc. 23, pp. 10–11, 17–18, ¶¶ 59, 67, 105(a–b, j–k).

Accordingly, SHP's widespread practice of delaying and denying necessary medical care to ill and chronically ill detainees, which proximately caused the injurious delay in Wennermark's care, states a § 1983 unconstitutional conditions of confinement claim against SHP. Thus, its motion to dismiss should be denied.

> d)  Plaintiff states an episodic acts or omissions claim.

Plaintiff also alleges that his denial of medical care resulted from official policy decisions made with deliberate indifference to the known risk of serious harm to prisoners by SHP's corporate policymakers, satisfying the requirements of *Jauch v. Choctaw Cty, Miss.*, 874 F.3d 425, 435 (5th Cir. 2017), to allege SHP is responsible for the expected results of those official policy decisions. Doc. 23, pp. 12–15, 17–19, ¶¶ 72–74, 84–85, 87–90, 92–93, 105–113. These allegations are plausible because so many staff engaged in the same misconduct, *see id.* at 5–11, ¶¶ 28–69; *Balle v. Nueces Cnty., Texas*, 952 F.3d 552, 560 (5th Cir. 2017) (can infer unwritten policy and

---

[6] *See also Borden v. Fort Bend Cty., Tex.*, No. H-19-551, 2019 WL 6344473, *11 (S.D. Tex. Nov. 27, 2019) (plaintiff stated conditions of confinement claim, even without reference to other detainees, for jail's alleged routine practice of refusing to provide medications to detainees at risk of serious harm and of staff ignoring requests for medical assistance); *Nichols v. Brazos County*, H-19-2820, 2020 WL 956239 at *1, *9 (S.D. Tex. Feb. 26, 2020) (plaintiff stated conditions of confinement claim for jail which allegedly knew detainee required medication for life-threatening medical conditions yet administered only one dose of medication over seven days).

deliberate indifference to inadequate medical care from allegations that multiple jail staff ignored obvious medical need), and because multiple staff, including Stinnett, made false statements to hide the lack of care to Wennermark. Doc. 23, pp. 7, 9–10, ¶¶ 39, 56, 62–63; *Sanchez*, 956 F.3d at 793 (evidence jailers were dishonest and tried to cover up misconduct allows the inference that "such dishonesty and an apparent cover-up is 'typical of extended or pervasive misconduct.'").

e) <u>SHP purposefully failed to train medical providers in their duty to provide access to medical care.</u>

SHP is independently liable, under *Monell*, for its employees' constitutional violations due to its failures to train which proximately caused Wennermark's injuries.

"[T]he failure to provide proper training may fairly be said to represent a policy for which the [municipality] is responsible, and for which the [municipality] may be held liable." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, n.10 (1989). Even for one constitutional violation, the Fifth Circuit has held a municipality is liable for failure to train officers when (1) the need for training "should have been obvious to" the policymaker, (2) the violation was an obvious consequence of that lack of training, and (3) the failure to train caused the constitutional violation. *Brown v. Bryan Cnty., OK*, 219 F.3d 450, 460 (5th Cir. 2000); *see also Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) ("[E]ven absent proof of pattern, deliberate indifference can still be inferred if the factfinder determines that the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy."); *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (applying the same rule). Plaintiff alleges SHP failed to train jail medical providers on the requirement to provide detainees access to medical care; the dangers of infection, diabetic neuropathy, or other common emergency medical conditions; on any standard operating procedures at all; or otherwise in a manner that would ensure adequate care for medical conditions

21

that exceeded the ability of the jail to adequately treat. Doc. 23, pp. 12–15, 17–18, ¶¶ 73–76, 91, 105(d–h, m). For these training omissions, Plaintiff alleges facts that satisfy each of the three elements of municipal liability, even for a "single incident," in *Brown*. 219 F.3d at 460.

First, the need for training on access to medical treatment and emergency medical treatment was obvious because SHP assigned a solitary licensed vocational nurse to DeWitt County, and placed her in the position of directly reaching medical diagnoses and deciding on treatment plans, despite the fact that such care exceeds the scope of practice for an LVN. Doc. 23, pp. 3, 12–14, 17–18, ¶¶ 11, 73–75, 84, 89, 105(m). Further, even when the LVN's work was supervised by Kiening, they still were expected to tide detainees over until their release to delay off-site transportation. *Id.* In this context, SHP's failure to provide training on detainees' access to medical care and failure to provide standard delegated orders satisfies the first, key element of the single incident exception. Analogous to *Canton*, the SHP policymakers knew "to a moral certainty that their [jail medical providers] will be required to" provide access to medical care for sick inmates who were detained and unable to care for themselves, Doc. 23, pp. 13, 16, 19, ¶¶ 89, 92, 108, but SHP failed to adopt any training on basic features of this obviously recurring scenario. *City of Canton, Ohio*, 489 U.S. at 390, n.10; Doc. 23, pp. 12–15, 17–18, ¶¶ 73–76, 91, 105(d–h, m). As a result, "the need to train" on their constitutional duties to provide medical care in those recurring situations "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton, Ohio*, 489 U.S. at 390, n.10.

A jail medical service with *no* training on inmates' access to medical care is obviously deficient—particularly where jail medical providers are required to be the gatekeepers even in medical emergencies—like the hypothetical discussed in *City of Canton* and like other cases where the Fifth Circuit has found *Monell* claims. *Compare id. with* Doc. 23, pp. 12–15, 17–18, ¶¶ 73–76,

91, 105(d–h, m); *see also Morris v. Dallas Cnty*, 960 F.Supp.2d 665, 668 (N.D. Tex. 2013) (denying summary judgment to county based on single-incident exception for its failure to train staff how to observe and assess detainee medical needs and respond to needs where staff acted as gatekeepers to medical care); *Brown*, 219 F.3d at 456 ("no training on arrest situations" sufficient for single incident liability); *Littell*, 894 F.3d at 620 (reversing dismissal of *Monell* claim due to "no training" on "invasive searches of students' persons").

Here, SHP knew its employees would be, and routinely were, placed in recurring situations where they must decide whether to provide detainees access to medical care. Doc. 23, pp. 5–6, 11–16–17, 19, ¶¶ 28, 31–35, 69, 73, 76, 78, 83–84, 89, 92, 108. Accordingly, "the need [for SHP] to train [its employees] in the constitutional limitations on the [the provision of medical care in jail] … can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton*, 489 U.S. at 390, n.10; *see also Silva v. Donley Cnty. Texas*, 32 F.3d 566, 1994 WL 442404, *5–6 (5th Cir. 1994) (lack of training on suicide prevention, combined with lack of regular cell checks and using a single deputy for dispatch and monitoring, sufficient to affirm denial summary judgment as to sheriff).[7] Thus, Plaintiff has satisfied the first, critical element of the single incident exception.

Second, the delays and denials for Wennermark are exactly the category of constitutional violation that SHP obviously risked incurring by not training its staff and contractors on the constitutional duties to provide and not to delay medical care. Doc. 23, pp. 12, 13, 16, 19, ¶¶ 76, 89, 92, 108; *see also Morris*, 960 F.Supp.2d at 687 (reasonable jury could find that unconstitutional

---

[7] *See also, e.g.*, *Benjamin v. Baytown Police Dep't*, No. 4:17-CV-01198, 2018 WL 1033255, at *2 (S.D. Tex. Feb. 21, 2018) (denying motion to dismiss where plaintiff alleged a lack of training for officers regarding hearing aids lead officers to remove his hearing aids during booking, then to use excessive force while in jail because he appeared noncompliant with commands he could not hear).

denial of medical care was obvious consequence of lack of training).

Finally, because Kiening and Stinnett were not trained to provide medical care when necessary to prevent serious harm, were not provided standard delegated orders to govern treatment that would otherwise be outside Stinnett's scope of practice, and were not trained on their duty to provide access to off-site care when necessary, Wennermark was denied necessary medical care and injured as a result. Doc. 23, pp. 12, 15, 19–20, ¶¶ 71, 76, 93, 111, 114–115. As discussed above, this violated Wennermark's constitutional rights. *See supra* pp. 6–10.

These facts are analogous to *Littell*, where the government invested the power to search any student in a person who had not been trained to limit such searches based on the Constitution. *Littell*, 894 F.3d at 626. Analogously, here, SHP empowered and trained Stinnett and Kiening to withhold access to on- and off-site medical care, as well as empowered them to engage in deficient medical care to delay more expensive necessary treatment. Doc. 23, pp. 5–6, 11–16–17, 19, ¶¶ 28, 31–35, 69, 73, 76, 78, 83–84, 89, 92, 108. Thus, similar to the school official assigned to conduct investigations in *Littell*, SHP "expected, or even intended" that jail providers would decide to withhold medical care—despite the absence of any training on the constitutional limits of this conduct. *Id.*; *see also Drake v. City of Haltom*, 106 Fed. Appx. 897, 900 (5th Cir. 2004) (reversing dismissal where alleged lack of training allegedly caused male jailers to abuse female detainees).

Accordingly, Wennermark states claims against SHP under § 1983 both for its widespread unconstitutional conditions of confinement and its failures in training which were the moving force of the violations of his constitutional rights.

### C. SHP discriminated against Wennermark by denying him reasonable accommodations for his disabilities and inflicting unwarranted pain.

Similarly, as to the ADA and RA claims, rather than merely alleging treatment below the standard of care, the amended complaint specifically alleges that SHP and its agents refused to

accommodate Plaintiff's disability and intentionally inflicted disproportionate pain, suffering, and other harms because of his known disability. Doc. 23, pp. 5–12, 23–24, ¶¶ 28, 33–37, 40–54, 57–62, 64–71, 128–138. Plaintiff thus states claims for disability discrimination.

An ADA and RA plaintiff must show: (1) that he was a qualified individual within the meaning of the acts; (2) that he was excluded from, or denied benefits of, services, programs, or activities of the public entity, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.[8] *Cadena v. El Paso Cnty., Tex.*, 946 F.3d 717 (5th Cir. 2020); *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997). Regarding the third element, however, the ADA and RA additionally impose an affirmative obligation upon public entities to make reasonable accommodations for disabled individuals. *Bennett-Nelson v. La Bd. Of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citing 42 U.S.C. § 12131(2)). Thus, to state a claim for failure-to-accommodate under the ADA, Plaintiff must allege (1) Wennermark was a qualified individual with a disability, (2) his disability and its limitations were known by the covered entity, and (3) the entity failed to make reasonable accommodations. *Ball v. LeBlanc*, 792 F.3d 584, 596, n.9 (5th Cir. 2015). The intentional denial of a necessary and reasonable accommodation constitutes intentional discrimination. *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575–76 (5th Cir. 2002).

*1.  Wennermark was a qualified individual with a disability whose limitations were known to SHP.*

It is indisputable that Wennermark had a disability: diabetes mellitus, an endocrine disorder. Doc. 23, p. 24, ¶ 133. This disability made him particularly vulnerable to wounds in his

---

[8] Courts interpret the ADA and RA functionally identically. *Frame v. City of Arlington*, 657 F.3d 215, 223-24 (5th Cir. 2011); *see also Bennett-Nelson,* 431 F.3d at 454. The only significant difference is that the entity must receive federal funds to be subject to the RA, 29 U.S.C. § 794(a), which SHP does. Doc. 23, p. 23, ¶ 128.

extremities due to diabetic neuropathy, which also substantially impaired his sensation, healing, and immune system compared to the average person. Doc. 23, pp. 4–5, 8, 24, ¶¶ 16, 19–22, 26, 45–46, 134–135; *see also* 42 U.S.C. § 12102(1)(A), (2) (defining "disability" as an "impairment that substantially limits one or more major life activities" and explicitly including seeing, walking, standing, and the normal operations of the endocrine and immune systems within the scope of major life activities); *see also* 29 C.F.R. § Pt. 1630, App. (noting diabetes by definition is a disability); *Bridges v. City of Bossier*, 92 F.3d 329, 336, n.11 (5th Cir. 1996) ("interpretive guideline to the ADA indicates a few diseases that constitute ADA disabilities *per se* (i.e. HIV and insulin-dependent diabetes)."). SHP does not dispute that Wennermark meets this threshold in its motion. *See* Doc. 34, pp. 10–13. It is well-settled that disabled detainees in correctional facilities like the DeWitt County jail are "qualified" to access the general programs and benefits of the jail. *See Penn. Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998); *Feliz v. El Paso Cnty.*, 441 F.Supp.3d 488, 505–06 (W.D. Tex. 2020).

Further, SHP was aware of Wennermark's diabetes and the limitations it imposed on him including a compromised ability to heal from wounds and walk normally and without pain once his diabetic ulcer grew. Doc. 23, pp. 5–8, 10, 21, 22, 24, ¶¶ 22, 23, 31–33, 43, 44, 61, 62, 121, 123, 124, 134, 135. SHP does not argue otherwise. *See* Doc. 34, pp. 10–13.

### 2.   *SHP excluded Wennermark from jail programs and services.*

SHP denied or excluded Wennermark from accessing the programs and services the jail offered to non-disabled detainees, including, but not limited to, medical care, access to court, and safe housing. Doc. 23, pp. 24–25, ¶¶ 131, 137. Because SHP did not provide Wennermark with accommodations necessary to address his diabetes and diabetic ulcer, Wennermark suffered a painful impairment that significantly decreased his ability to access essentially all jail programs

when compared to other detainees who, for example, could walk to the clinic, walk to court, walk around their cell or unit, and engage in jail recreation activities easily and without pain. Doc. 23, pp. 5–12, 23–24, ¶¶ 28, 33–37, 40–54, 57–62, 64–71, 128–138; *see also United States v. Georgia*, 546 U.S. 151, 157 (2006) ("it is quite plausible that the alleged deliberate refusal of [corrections] officials to accommodate … disability-related needs in such fundamentals as … medical care … constitute[s] exclusion from participation in or denial of benefits of the [jail's] services, programs, or activities.") (cleaned up).

### 3.  *SHP intentionally discriminated against Wennermark.*

SHP intentionally discriminated against Wennermark in two ways: first, by refusing to provide him with reasonable accommodations that would have allowed him to have equal access to jail programs and services and, second, by inflicting pain, punishment, and suffering on him that was not imposed on non-disabled detainees.

First, Wennermark's need for accommodations for his diabetes and diabetic ulcer in the forms of medical care and mobility (walking) accommodations was obvious, open, and apparent as he repeatedly requested these accommodations, such accommodation was eventually ordered by a doctor, and Kiening and Stinnett knew he needed them. Doc. 23, pp. 5–11, 20–23, ¶¶ 27–36, 40–43, 47–54, 57–69, 117–126; *see e.g., Phillips v. Prator*, No. 20-30110, 2021 WL 3376524, *4 (5th Cir. 2021) (need for simplified communication or getting help was an obvious accommodation for autistic child). Nonetheless, SHP denied Wennermark these accommodations that its staff knew were both reasonable and necessary.

Contrary to SHP's assertions, courts in the Fifth Circuit routinely find that jails and prisons violate the ADA and RA when they deny reasonable accommodations that are "medical" in nature to prisoners when those medical devices, medications, or treatments are necessary for the prisoner

27

to otherwise have equal access to the services and programs of the jail or prison. *See, e.g.*, *Cadena v. El Paso Cnty.*, 946 F.3d 717, 726–28 (5th Cir. 2020) (reversing summary judgment for county on ADA claim where medical staff issued direction for detainee to have wheelchair to accommodate disabilities, but jail staff denied it); *O'Neil v. Tex. Dep't of Crim. Justice*, 804 F.Supp.2d 532, 538 (N.D. Tex. Apr. 7, 2011) (family of asthmatic prisoner who died from asthma attack stated ADA claim for failure to accommodate his disability based on denial of medication and physician appointments); *McCoy v. Tex. Dept. of Crim. Justice*, No. C-05-370, 2006 WL 2331055, *8 (S.D. Tex. Aug. 9, 2006) (denying summary judgment on ADA and RA claim where prison denied asthmatic his prescribed medications necessary for him to live and access jail's programs); *Estrada v. Director*, *TDCJ-CID*, No. 5:20-CV-030-BQ, 2022 WL 16919789, *8 (N.D. Tex. Nov. 14, 2022) (failure to provide the first-floor, single-cell ordered or recommended by medical professionals stated ADA claim for intentional discrimination where denial of that cell prevented him from accessing meals, medications, and commissary, and prevented him from sleeping); *Borum v. Swisher County*, No. 2:14-cv-127-J, 2014 WL 4814541, *11 (N.D. Tex. Sept. 29, 2014) (plaintiffs stated a claim under the ADA where jail "completely failed" to provide disabled inmate medical care necessary to treat his disabilities where such care was a reasonable and necessary accommodation for him to access the jail's services and programs); *Forster v. Bexar Cnty.*, No. 5:21-cv-00765-JKP-RBF, 2022 WL 2820857, *2–3, *32–33 (W.D. Tex. July 19, 2022) (jail that failed to provide mental health care including lab work to mentally ill detainee stated an ADA claim for the jail's failure to provide reasonable accommodations).

The cases cited by SHP do not hold otherwise. Instead, each concerned a prisoner who did not have a disability, did not identify how they were treated differently, or failed to allege the entity knew the medical accommodations were necessary. *See Penner v. Gaines Cnty., Texas*, No. 23-

10985, 2024 WL 3372674, *1 (5th Cir. July 11, 2024) (plaintiffs failed to allege prisoner was treated differently because of his disability or that the jail knew accommodations were necessary for any disability); *Whetstone v. Hall II,* No. 4:17CV158-JMV, 2018 WL 1022586, at *2 (N.D. Miss. Feb. 22, 2018) (pro se inmate failed to allege he had a disability, but even assuming he did, he failed to allege he was treated differently because of his disability).[9] In contrast to the plaintiffs in each of these cases, Plaintiff does have a qualifying disability, identifies the programs and services he was denied or provided unequal access to as a result of being denied accommodations, and alleges SHP was aware of his need for these accommodations. *See supra* pp. 25–27.

Ironically, SHP also cites *Cadena v. El Paso County*, except that case reversed dismissal of an ADA claim where that plaintiff, a mobility impaired pretrial detainee, was not provided a wheelchair, causing her to fall several times and impairing her access to jail facilities. 946 F.3d at 721–22. At a minimum, Wennermark has similarly alleged SHP invaded "a disabled inmate's right to mobility within a prison" as the Fifth Circuit found in *Cadena*, 946 F.3d at 724, because Stinnett participated in forcing Wennermark to walk to court and aggravate his injury as well as denied him a wheelchair that jail staff claimed he requested to access necessary medical care at least once. *See* Doc. 23, pp. 10–11, 22, ¶¶ 62, 69, 124.

Second, Plaintiff alleges ADA and RA claims based on SHP's causing him substantial pain and suffering not inflicted on other non-disabled detainees. A failure to accommodate a disabled detainee that results in the detainee suffering more pain and punishment than non-disabled detainees also constitutes intentional discrimination. *McCollum v. Livingston*, No. 4:14-CV-3253, 2017 WL 608665, *37 (S.D. Tex. Feb. 3, 2017); *McCoy*, No. C-05-370, 2006 WL 2231055, at *7;

---

[9] The reasoning of *Whetstone II* is clearer in the underlying order for which reconsideration was denied: *Whetstone v. Hall I*, No. 4:17CV158-JMV, 2018 WL 522778, at *2 (N.D. Miss. Jan. 23, 2018).

*see also Estrada*, No. 5:20-CV-030-BQ, 2022 WL 16919789, at *4, *7 (quoting *McCoy* and noting

that plaintiff suffered pain as a result of being denied reasonable and necessary accommodations).

Here, Plaintiff alleges that SHP's jail providers knew he required accommodations in the form of

timely, correct medical treatment for his diabetic ulcer as well as mobility accommodations, yet

they not only refused to provide these but inflicted additional suffering on him by then forcing him

to walk on the excruciating disability-related wound. Doc. 23, pp. 5–11, 20–25, ¶¶ 23–54, 57–69,

117–126, 134–137. Where Wennermark suffered more pain and suffering than other detainees due

to the lack of reasonable accommodation for his disability, SHP intentionally discriminated against

him.

### 4. *SHP is an alleged recipient of federal funds under the Rehabilitation Act.*

Plaintiff alleges that SHP receives federal funds. Doc. 23, pp. 23, ¶ 128; *see also id.* at 2,

13, ¶¶ 4, 84 (County receives federal funds and hired SHP). The Court should reject SHP's effort

to dispute these allegations for two reasons.

First, SHP fails to cite any caselaw for the proposition that a factual allegation about the

source of funding is necessarily "boilerplate," "pure speculation," or "conclusory." Doc. 34, p. 12.

Instead, SHP is asking this Court to reject a factual allegation because it disagrees, which runs

contrary to the mandate of Rule 12. *See, e.g.*, *Turner*, 663 F.3d at 775 (allegations must not only

be accepted, but also read in the light most favorable to the complaint). As whether SHP accepts

federal funds is a factual, not legal, question, the Court should accept the allegation at this stage.

Second, Plaintiff's allegation is also plausible because federal funds received through an

intermediary—for example, DeWitt County paying SHP—also trigger federal funding clause

statutes. *See, e.g.*, *Grove City College v. Bell*, 465 U.S. 555, 556 (1984) (college financial aid

program subject to Title IX because students receive federal grants to help pay college tuition);

*Bennett-Nelson v. Louisiana Bd. Of Regents*, 431 F.3d 448, 453 (5th Cir. 2005) (university subject to RA because its students receive federal funds through work study and grant programs, which in turn help them pay tuition); *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical Cntr.*, 765 F.2d 1278, 1295 (5th Cir. 1985) (private hospital's receipt of money through patients' Medicare and Medicaid coverage means they receive federal funds and are subject to the Rehabilitation Act). Thus, even if the Court accepts SHP's conclusory argument that it is inherently implausible for a private entity to directly receive federal funds, it is certainly plausible that DeWitt County receives federal funds and that these, in turn, were paid to SHP.

Accordingly, Plaintiff has stated ADA and RA claims for SHP's failure to accommodate his disabilities and infliction of additional pain and punishment on him. The Court should deny the motion to dismiss.

### D.  SHP, Kiening, and Stinnett admit Plaintiff states state law claims against them.

Plaintiff has pleaded that because the Defendants engaged in intentional misconduct, their degree of culpability far exceeds the threshold for state law negligence—or, alternatively, they were negligent. Doc. 23, p. 26, ¶ 140. Defendants' motion directly concedes that "Plaintiff's Amended Complaint sets forth allegations that amount to … a claim for medical negligence," "these are allegations of general negligence," and "negligence … is exactly what Plaintiff alleges here." Doc. 34, pp. 9–10. Further, Defendants never attempt to dispute that Plaintiff has stated a claim for negligence.

And, indeed, the amended complaint alleges specific facts satisfying all of the well-known elements of negligence. Doc. 23, pp. 5–12, 25–26, ¶¶ 25–29, 33, 40–43, 47–71, 139–142; *see, e.g.*, *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) ("[T]o recover for medical malpractice, the complainant must prove: 1) the physician had a duty to act according to a certain standard, 2)

breached that standard, and 3) the breach proximately caused the complainant to sustain injury.").

Accordingly, the motion should be denied as waived (and meritless) for the state law negligence claims.

### E. In the alternative, the Court should permit discovery and an opportunity to amend the Complaint before granting a Rule 12 motion.

Although the Court should deny the motion on its merits, if the Court would grant any part of SHP, Stinnett, and Kiening's motion to dismiss, then Plaintiff requests in the alternative that the Court grant Plaintiff leave to amend after the benefit of limited discovery. "The court should freely give leave [to amend pleadings] when justice so requires." FED. R. CIV. P. 15(a)(2).

This case involves the policies, procedures, and history of Stinnett and Kiening specifically and SHP broadly, as well as details of SHP's funding and operations, which are not available to Plaintiff before bringing suit. If the Court needs additional information on the subjects Defendants attack—such as more specificity regarding training, practices, policymakers, or funding of SHP—Plaintiff should not be expected to plead even more details prior to discovery. All of those subjects are only known to Defendants, at least until Plaintiff has had the opportunity to investigate through discovery. *See supra* pp. 5–6. Plaintiff has served initial written discovery as well as received informal production of written documents, but has not received formal discovery responses yet.

Thus, at a minimum, the Court should deny Defendants' motion without prejudice until Plaintiff has had the opportunity to conduct discovery—specifically, written discovery to the Defendants and taking the depositions of DeWitt County, its Sheriff, the named individual defendants, and a representative of SHP under Rule 30(b)(6)—and amend the complaint.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Southern Health Partners, Kiening, and Stinnett's motion to dismiss.

Dated: February 11, 2025.

Respectfully Submitted,

**EDWARDS LAW**
603 W. 17th St.
Austin, TX 78701
Tel.  512-623-7727
Fax.  512-623-7729

By____/s/ *Jeff Edwards*_____
      JEFF EDWARDS
      State Bar No. 24014406
      jeff@edwards-law.com
      MIKE SINGLEY
      State Bar No. 00794642
      mike@edwards-law.com
      DAVID JAMES
      State Bar No. 24092572
      david@edwards-law.com
      LISA SNEAD
      State Bar No. 24062204
      lisa@edwards-law.com
      PAUL SAMUEL
      State Bar. No. 24124463
      paul@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

       I certify, by my signature below, that the foregoing has been served on counsel for all parties through the Court's electronic filing system.

       /s/ Jeff Edwards_____
       Jeff Edwards